Larry Wayne **WHITE**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 69332.

Court of Criminal Appeals of Texas, En Banc.

Feb. 15, 1989.

---

Carolyn Garcia (Court appointed), Houston, for appellant.

John B. Holmes, Jr., Dist. Atty. and Winston E. Cochran, Jr., Asst. Dist. Atty., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

MILLER, Judge.

This automatic appeal[1] results from a conviction for capital murder pursuant to V.T.C.A. Penal Code, Section 19.03(a)(2).[2] Upon the jury's return of affirmative findings to two special issues submitted at the punishment phase, Article 37.071(b), V.A.C.C.P., appellant's punishment was assessed at death. Article 37.071(e), supra.

\* \* \* \* \* \*

(2) the person intentionally commits the murder in the course of committing or attempting to commit ... robbery ...

1. See Article 37.071(f), V.A.C.C.P.

2. Section 19.03, supra, provides in relevant part: (a) A person commits an offense if he [intentionally or knowingly causes the death of an individual] under Section 19.02(a)(1) of this code and:

The indictment presented against appellant alleged, in pertinent part,

[That on] March 1, 1977, [appellant] did then and there unlawfully while in the course of committing and attempting to commit robbery, intentionally cause the death of Elizabeth St. John, hereafter styled the Complainant, by choking her with his hands and stabbing her with a screwdriver.

The record establishes the 72 year old complainant, Elizabeth St. John, moved from the Austin area to return to Houston, in late February of 1977, about a year after her husband had died. Mrs. St. John moved in with Lavelle Wasson, her friend of 25 years, who owned some apartment complexes. St. John was to occupy number three, an upstairs apartment of the Airline complex which was in front of the Wasson's house.

Appellant had been employed by the Wassons to do maintenance work at their Shepard apartment complex. On Monday, Tuesday and part of Wednesday of the first week in March,[3] appellant and Wasson spent their time painting St. John's apartment while she looked on. Her furniture had already been moved in, so they "painted around it".

As the three left the apartment on Wednesday afternoon, St. John pointed out a locking device she had installed on her door that made it impossible to turn the knob or open the door from the outside, even with a key. Wasson asked appellant to move a box spring mattress that was in a hall corner across from St. John's apartment. Appellant said he would carry it out the next day.

Appellant asked St. John if she were planning to stay up in the apartment that night; she told him "yes".

Later in the day, St. John returned to Wasson's house to obtain envelopes and paper for writing her children, then headed back to her apartment. Appellant also came by Wasson's house to return keys to

a storage room. Before he left, appellant told Wasson—who was also an elderly lady —"Bell, that sure is a cute jumpsuit. I like what's in it." Wasson passed the comment off. Appellant told Wasson he was going back to the Shepard Apartments.

However, before Wasson went to bed at 8:30 or 9:00 p.m., she noticed appellant's car was still parked in the parking lot. She also noticed St. John's car in the lot in front of the complex.

At approximately 10:30 p.m. Wasson and her husband were awakened by the tenant across the hall from St. John who reported the mattress in the hall had been "completely engulfed" in flames. After the tenant had doused the flames and reported the incident to the Wassons, they all returned to the hall, pulled the mattress out to a front balcony, threw it down to the ground and poured more water on it.

Wasson at this point noticed appellant's white Valiant was still parked out front. St. John's Pinto, however, was gone.[4] Wasson assumed her friend had gone to visit the people who had moved her to Houston.

Wasson had told St. John she had an early doctor appointment on Thursday, March 3rd, but she would be up to the apartment to measure for blinds after that. When Wasson went to the apartment at 8:30 or 9:00 a.m., she noticed appellant's car was still there and St. John's was still gone.

Because the special lock was still on the door and St. John's car was gone, Wasson became alarmed. She went home and told her husband they needed to see about St. John, that something was wrong. No telephone had been installed in St. John's apartment. Just as the Wassons were leaving, Pat McGill, the manager of Shepard Apartments (and appellant's boss) called and said something that caused Wasson concern about St. John. She told McGill to come over.

3. This was February 28, March 1 and 2, 1977.

4. Appellant had only a week earlier returned from Florida driving the white Valiant with Florida license plates. He told Wasson he had painted for an elderly woman and she gave him $150.00 and the car.

About dusk on March 3rd, McGill and Wasson went to St. John's apartment door. Mrs. McGill crawled through a window, accessible from the balcony. She told Wasson, "Bell, she's in there dead." Dave Calhoun and L.E. Doreck of the Houston Police Department Homicide Division were the first officers on the scene. Because of the lock device on the door, the officers had to break it in. The temperature in the apartment was so hot in the March evening, it was "staggering." Calhoun discovered a gas floor heater was on as high as it would go. The apartment was neat; there was no sign of forced entry or a struggle. St. John's body, clothed only in a bra, pullover blouse and stockings which were rolled to the ankle, was covered with a blanket. Upon uncovering the body, Calhoun observed bruises on the chin, neck and throat. When the body was rolled over, the officers found a screwdriver protruding from the lower back.

Eduardo Bellas, M.D., a Harris County Assistant Medical Examiner who assisted in the autopsy, would later testify the 92 pound, 5'4" St. John, a woman of "slight" build, had died as a result of "two mechanisms of death": asphyxia due to strangulation;[5] and, the penetration of the screwdriver four inches into the diaphragm, liver and right chest cavity. There was no evidence of defensive wounds. Acid phosphatase tests and microscopic study of vaginal swabs revealed sexual intercourse had occurred within 24 hours of the discovery of the body. Bellas opined St. John had been stabbed first, then strangled, but stated there was no way to be sure. In addition to the clothing, six gold rings and small diamond stud earrings remained on the body.

At the crime scene, Calhoun was directed to the white Valiant in the parking lot in which appellant had recently arrived after a trip to Florida. [See n. 4, *ante.*] The National Crime Information Center (NCIC) computer indicated the car was "wanted." Officer Joe Herrin, who was in charge of the mobile crime scene unit, attempted to lift finger prints off of things "the suspect would touch", such as the front door, the screwdriver and the car "that was wanted. in another homicide."[6] One print was lifted off a Coors beer can found in the white Valiant.

Homicide Sergeant D.R. James went through St. John's purse which was found in the apartment. Identification and other papers were obtained from the purse, but "nothing of great value". James testified he would have checked the purse for money and valuables, and did not recall finding any money.

Another Homicide Detective, John L. Bonds, went to the scene the following morning, Friday, March 4th, to do follow up investigation. He checked out the missing car which had belonged to the victim and found it registered to her. He entered it into the NCIC, requesting a hold on the vehicle and any occupant for examination of evidence. Norbent L. LeBlanc, a senior latent print examiner, testified none of the prints lifted from the apartment or the Valiant, other than the one off the Coors can, could be identified as appellant's.

Three days later, at 3:23 a.m. on March 8th, Police Officer Donald Edge of Myrtle Beach, South Carolina, was patrolling the

5. Bellas testified St. John was already suffering from severe coronary arteriosclerosis, and it would therefore not require significant force to close off her air passages.

6. Defense counsel's objection and request for instruction were sustained. The trial judge told the jury:

* * * Ladies and gentlemen of the jury, part of the answer that this witness gave just before you were retired about, 'I also dusted a car that was wanted in another homicide', you will disregard that answer for all purposes.

We include the disputed statement in our fact recitation for two reasons: first, it is doubtful this information was effectively removed from the jury's consideration by the trial court's instruction; and, secondly, the State subsequently presented proof of this extraneous transaction (which constituted an offense) in the punishment phase. Though it was markedly similar to the transaction in which appellant murdered Elizabeth St. John, the State neglected to offer the "extraneous offense" at the guilt phase on the issue of appellant's larcenous intent at the time of the murder of St. John. [See Point of Error No. 1, *post,* at 814–816.]

south end of the deserted resort town. He observed appellant near a restaurant which was closed for the "off season". About three feet away from appellant was parked a light green Ford Pinto station wagon bearing Texas tags. The driver's door was open. Edge arrested appellant,[7] warned and searched him. Edge found a set of keys in appellant's left front pocket; the keys fit the ignition and doors of the Pinto.

Numerous objects were in the Pinto "ranging from jewelry to tools to a stereo plus clothing". The glove compartment was open, and from it Edge obtained the car registration papers. The car was registered to Elizabeth St. John of Leander, Texas.

Lieutenant Mitchell Glen Kemp was the Investigator on call in Myrtle Beach on March 8th. He arrived on the scene of appellant's arrest at about 3:30 a.m., then back at the station around 4:00 a.m. For the next five hours, Kemp was "gathering information," by computer, as well as from speaking with officers in Houston by telephone regarding appellant "and a homicide in Houston." Kemp and his supervisor, Lieutenant Luke, interviewed appellant starting at around 10:00 a.m. Appellant waived his rights and his inculpatory statement was reduced to writing. The salient content of that statement, admitted before the jury, is as follows:

> The car that I was in this morning came from Houston, Texas. I took it from the Airline Apartments in Houston, after I choked Ms. Elizabeth St. John and stabbed her in the back with a screwdriver. I was drinking at the time, and she had offered to give me a bonus of $20.00 for painting work I had done. I met Ms. St. John through the manager of the apartments when I was working at the apartments. I was in Houston for about a week before I killed her. I killed Ms. St. John a week ago Tuesday; it has been one week ago today, and I left the screwdriver there. * * * we had had intercourse on the couch before I killed her. I would say that she was 52 to 56 years old maybe. * * * [8] After I choked her and stabbed her, I left Houston that night and I took the stereo that is in the car now, $45–$50, a lamp, and the jewelry that is in the toolbox on the front seat. I got to Myrtle Beach last night between 6:00 and 6:30 P.M. and went to Dorothy's Green Bar or Green Lounge.

In his first point of error, appellant contends the evidence is insufficient to prove he murdered his victim "in the course of committing or attempting to commit robbery" as was required for a finding of guilt under the court's charge to the jury.

The thrust of appellant's argument is that, in order for his conduct to be "in the course of robbery", it was incumbent upon the State to prove, at a minimum, that he formed the intent to take St. John's property before he killed her. While appellant admitted he killed St. John and took her car, he did not admit killing her before, during, after or in flight from taking her car and other property. In fact, according to appellant's brief, there is no proof that any of the items found by Myrtle Beach officers in St. John's car, actually belonged to St. John. Appellant also points to evidence establishing there was no forced entry into the victim's apartment, that the victim was still wearing her jewelry when her body was found and finally, there was no evidence of any plan to commit robbery before appellant entered St. John's apartment. All of this presumably prevents a rational trier of fact from determining appellant's intent with regard to the robbery, at the time of the killing, beyond a reasonable doubt.

---

7. The reason for appellant's arrest was recited at the end of appellant's inculpatory statement, but it was deleted by agreement of the parties from the exhibit considered by the jury. We have therefore also deleted it from our fact recitation.

8. The exhibits of the statement and the final arguments of counsel reflect two sentences were excised by the State where indicated above, because they were "self-serving"; the State would "not vouch" for them. Appellant then restored the part of one of the sentences which reads: "... we had intercourse on the couch before I killed her."

We agree that the point at which appellant formulated his intent to take his victim's property is critical to differentiating, in the abstract, between his commission of capital murder in the course of robbery and his commission of a first degree murder, followed by theft from a corpse, a third degree felony. See Section 31.03(d)(4)(B) V.T.C.A., Penal Code.

When considering the sufficiency of the evidence to support a guilty verdict, this Court must view the evidence in the light most favorable to the verdict in order to determine whether any rational trier of fact could have found all of the essential elements of the crime beyond a reasonable doubt. *Fierro v. State*, 706 S.W.2d 310 (Tex.Cr.App.1986). Therefore, the ultimate question before us in this case is whether *any* rational trier of fact would be justified in finding from the evidence as a whole, that appellant intended to take St. John's property before, or as, he murdered her.

We observe that, if appellant entered St. John's apartment the evening of the murder with the intent to take possessions from the apartment *or* her car after he raped and/or killed her, the murder would be clearly in the course of robbery. If appellant formed the intent to take St. John's car only *after* he entered and had intercourse with her, in order to escape the scene, then killed his victim to avoid apprehension, the killing would likewise be in the course of robbery.

The only other hypothesis under the evidence is that appellant entered St. John's apartment with no thought of the property he had walked around and presumably observed while painting for the three preceding days, killed St. John for no reason (or in order to prevent her from reporting a rape), then only as an afterthought, decided to flee in St. John's car and take some of her property from the apartment as well.

We cannot say the jury's rejection of this last scenario was not a rational finding. Such a hypothesis is not "reasonable" at all when the evidence is considered as a whole.

A rational trier of fact would be justified in rejecting the notion that appellant spent three days in St. John's apartment, with her personal possessions all about him, and never considered taking any of them until after he killed her the evening of the third day. A rational trier of fact would be justified in rejecting the idea that appellant—a man who apparently wiped away all his fingerprints from his own car, as well as an apartment he had worked in for three days—just suddenly, as an afterthought planned the details of his escape after he killed St. John. Why did he take St. John's car instead of his own? Why kill her if not to obtain her keys and prevent her from reporting if not a rape, a theft?

Appellant would have us limit our consideration to the chronology of his "intent to rob" and his acts which "caused death" to his victim. We assign much significance, however, to the undisputed evidence that appellant did, in fact, "obtain and maintain" St. John's automobile. The jury was entitled to do likewise.

The circumstantial evidence combined with appellant's inculpatory statement establishes appellant left the murder scene around 10:00 or 10:30 p.m., turning the gas furnace as high as it would go and setting the mattress outside in the hall on fire, apparently attempting to precipitate an explosion or fire to conceal his deeds. A rational trier of fact would be justified in concluding that appellant would not interrupt his flight from Houston in the car of the very person he had just murdered, in order to acquire—legitimately or not—the furniture and other items mentioned in his statement. A rational trier of fact would be entitled to conclude appellant admitted taking the jewelry, money and furniture items while discussing the murder of St. John, because it was an integral detail of that transaction. The only reasonable inference from the evidence as a whole is that the jewelry, money, lamp and stereo mentioned in appellant's confession, were taken from the apartment of the deceased.

In *Banks v. State*, 643 S.W.2d 129 (Tex. Cr.App.1983), the Court found the evidence sufficient to support the finding that Banks murdered his victim in the course of committing a robbery. Banks told a witness he had been drinking beer with a boy and

"decided to kill the person for the hell of it and take his automobile." We emphasized this statement in finding the evidence sufficient upon the robbery element. Banks' statement—like appellant's here—was unclear in the sense that Banks did not state that his intent to take his victim's vehicle had been formed by the time he killed him. The jury had to infer that sequence from the statement and all the other evidence admitted. See also *Fierro v. State*, supra; and *Russell v. State*, 665 S.W.2d 771 (Tex. Cr.App.1983).

In his final argument, defense counsel told the jury they had a duty to acquit appellant if it was as "equally possible" and "just as reasonable" under the evidence that appellant formed his intent to steal from St. John after he killed her, as was the State's theory. This was the focus of most of the final arguments for both sides. This was the focus of lesser included offense instructions submitted to the jury. What was in issue was clearly and ably explained to the triers of fact by both counsel and the trial judge.

We cannot say the jury's rejection of appellant's scenario was not a rational finding. In fact, appellant's "hypothesis" is not "equally possible", "just as reasonable" or even "reasonable" under the facts established as a whole. To insist the jury exclude the mere "possibility" of such a scenario under this record—which would require the jury to ignore much of the evidence—would amount to a requirement that the State prove the elements of the crime beyond *all* doubt. We hold a rational trier of fact could find appellant's murder of his victim occurred "during the course of robbery" beyond a reasonable doubt. Appellant's first point of error is overruled.

■ Appellant's second point of error claims the trial court committed reversible error by failing to sustain his challenge for cause to venireman Willie Reader on the ground that Reader would automatically answer "yes" to the first special issue if he had found appellant guilty of the "intentional" capital murder charged in the indictment.

The prosecutor prefaced his examination of Reader by explaining this was the time for him to tell if there was anything about the law that bothered him. He assured Reader repeatedly throughout his voir dire that all he wanted to do was understand how the juror felt and told him nobody was going to "fuss" at him. The prosecutor explained the possible penalties in a capital case and Reader stated he had no objection to death as a penalty. Asked how long he had felt that way, Reader stated,

"Well, in my point [sic] I feel like if a person did a crime, they should pay for that crime."

The prosecutor next discussed general principles such as burden of proof and credibility of witnesses, and, *after reading the indictment* returned against appellant in this case, he explained the fact that the State was not required to prove premeditation or motive. He then returned to the capital murder statutory scheme including the issues presented for jury resolution in the first stage of trial. He told Reader that once a finding of "guilty" had been returned, the jurors were not required to go back and decide on a penalty of "life" or "death"; rather, the jury was asked to answer special issues, on which the State's burden of proof was also "beyond a reasonable doubt". He explained the effect of the answers to the special issues, then read the special issues to Reader.

Then the following occurred:

Q. * * * We don't have to prove to you beyond all doubt that the death was done deliberately and with reasonable expectation that death would occur, but just beyond a reasonable doubt. Before you could answer that question "yes," *would you require me to prove it to you beyond a reasonable doubt*"

A. *No, not really.*

The prosecutor explained to Reader that he needed a more definite answer; to aid the juror, he pointed out that no one knows why the Legislature used the word "deliberately" in the special issue, and said he knew "some people think 'deliberately' and 'intentionally' mean the same thing. They may or they may not; but for our purposes

here, if the Legislature had wanted to * * * they could have put 'intentionally' in there. *They put "deliberately," which is different from 'intentionally.'*

\* \* \* \* \* \*

Q. ... [Assume] you've already found the defendant guilty of intentionally committing capital murder. Okay. *Would you automatically answer issue number one 'yes' because you found the defendant guilty of capital murder?*

A. *Yes, I would.*

The assistant district attorney—"to make sure we're not misunderstanding each other"—explained to Reader the fact that, before a juror makes up his mind on the punishment issues, he may or may not hear additional evidence at the punishment stage of trial; that even though it is proper to consider all the evidence adduced at the guilt stage again on the punishment questions, "the law requires that you take whatever evidence you have and apply that and *then* make up your mind. * * * You take that evidence and then apply it to the issues and then you vote 'yes' or 'no'. * * * [d]epending on whether you're convinced beyond a reasonable doubt. Are you with me so far?"

A. Uh-huh.

Q. What I'm saying, and I think what you have answered me, was *because you found the defendant guilty of capital murder, you've already found he intentionally took a human life* in the course of one of these other elements that makes it a capital murder, *you would automatically answer issue number one 'yes'?*

A. *Yes. I still stick to that.*

Q. * * * Nobody is going to ask you for an example ... [but] *can you think of a case where you would answer special issue number one 'no'?*

A. *I can't think of a case.*

Q. Okay. Let me ask it this way. *You would automatically always answer special issue number one 'yes'?*

\* \* \* \* \* \*

A. I wouldn't say in every case I would say 'yes'; but in, [sic] just saying *in this case, I would say yes, I would.*

At this point the prosecutor left the matter and moved on to others. When the State's examination of Reader was concluded, the juror was passed to defense counsel who responded:

We submit there is cause based on his answer regarding question number one. He stated that he would answer 'yes' automatically, that if he entered a verdict of guilty to the offense of capital murder, he would automatically answer 'yes' to question number one.

The trial court summarily overruled the challenge for cause, and appellant exercised a peremptory challenge in order to excuse Reader.

The record reflects appellant used all his peremptory challenges during the course of voir dire and requested additional peremptory challenges to strike Marion Harvey Ponder, who was sworn and seated on the jury.

Appellant now contends juror Reader was disqualified under Art. 35.16, V.A.C. C.P., because he could not consider the full range of punishment.

The State's brief concedes "Reader repeatedly indicated to the prosecutor that he automatically would answer the first punishment special issue affirmatively after having found a defendant guilty of capital murder." [9] However, the State contends the failure to exclude the juror on appellant's challenge for cause was not reversible error because even though Reader "in effect said that he would always find that a defendant's conduct which caused the death of the victim was deliberate", etc., he never said he would disregard mitigating evidence on this issue.

---

9. Actually, Reader stated his feelings were limited to *this* case, a case in which he had heard the allegations in the indictment that appellant

caused the victim's death "by choking her with his hands and stabbing her with a screwdriver."

We believe that under the unique circumstances of this case the State's position is well taken. This Court has held that, as a matter of *law*, the meaning of "deliberately" under Art. 37.071, supra, Section (b)(1), is different from the meaning of "intentionally", under Section 6.03(a), V.T.C.A., Penal Code. *Heckert v. State*, 612 S.W.2d 549 (Tex.Cr.App.1981). See also *Lane v. State*, 743 S.W.2d 617 (Tex.Cr.App.1987); *Gardner v. State*, 730 S.W.2d 675 (Tex.Cr.App. 1987); *Fearance v. State*, 620 S.W.2d 577 (Tex.Cr.App.1981); E.g. *Brown v. State*, 554 S.W.2d 677 (Tex.Cr.App.1977); *Ex parte Sierra*, 514 S.W.2d 760 (Tex.Cr.App. 1974).

However, it is clear that in some cases, as a matter of *fact*, evidence which sufficiently establishes a killing was committed "deliberately" will also establish the killing was "intentional". While the evidence to be adduced in a given case is not a proper subject during voir dire, the record reflects in the instant case that the prosecutor was permitted, without objection, to read the indictment to venireman Reader. [See *ante* at 812 for recitation of indictment.] As a matter of common sense, some acts of murder of and by themselves reflect "deliberation" as comprehended by Art. 37.071(b)(1), on the face of the indictment. This is such a case.

The United States Supreme Court has made it clear that, for federal constitutional purposes, our special issues serve the function of allowing the sentencer to consider "mitigating circumstances". *Lowenfield v. Phelps*, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988).[10] Viewed as a mitigating circumstance, the deliberateness question is not one which will generally be proved by any new evidence offered at the punishment stage; rather, the proof necessary to shed light on "deliberateness", is evidence that has already been offered at the guilt/innocence phase of trial.

Neither the Legislature nor this Court has seen fit to define "deliberately"; rather, we have repeatedly stated it is a word which has a common meaning, simple in itself, which jurors are supposed to know. See *King v. State*, 553 S.W.2d 105 (Tex.Cr. App.1976), and its progeny. Accordingly, we cannot say there is anything wrong with a juror's visualizing himself as satisfied beyond a reasonable doubt that the defendant "intentionally" caused the death of a woman "by choking her with his hands and stabbing her with a screwdriver" (as was required by the prosecutor's hypothetical), and seeing that he would also and necessarily find such conduct was committed "deliberately".

Had the juror stated he would automatically answer special issue no. 2 "yes" after finding the killing was "intentional", a far more difficult question would be presented, for the second punishment issue is uniquely suited to the introduction of additional evidence at the second stage of trial; a refusal to consider mitigating evidence adduced at the punishment stage would clearly disqualify a prospective juror.

We do not, however, view venireman Reader's responses to mean he would refuse to consider mitigating evidence. No error is shown; this second point of error is overruled.

In his third point of error, appellant contends that the trial court erred by overruling appellant's challenge for cause to prospective juror Robert Bartlett. During the voir dire examination, the following exchange occurred:

Q. [PROSECUTOR] ... The state is allowed to sustain a conviction with a confession and the showing that an offense was committed. All right. Before you can base your verdict on that, however, that confession has to satisfy the elements contained in the indictment.

It doesn't lessen our burden of proof. It doesn't mean, "Wait a minute. They

---

**10.** The Court in *Lowenfield,* supra, stated the Federal Constitution requires a State's capital sentencing procedure to include nothing more than: (1) a narrowing of death-eligible murderers [which is met in Texas by the proscriptions of capital murder in Section 19.03, supra, sub- sections (a)(1)–(6) ]; (2) an opportunity for consideration of mitigating circumstances [which is met in Texas by our special punishment issues prescribed by Art. 37.071, supra, (b)(1)–(3) ]; and, (3) the exercise of discretion in applying mitigating factors.

don't have to prove one of these elements." Okay.

\*   \*   \*   \*   \*   \*

Q. [PROSECUTOR] Do you have a problem with that concept of law?

A. Maybe. Repeat it. You're saying if the State shows and proves the facts and the confession says the same things, then I have no problem? Is that what you're saying?

Q. No. That's not what I'm saying. I'm saying the confession, not in this case, but in any case, the confession is what shows you these elements. The confession is what sustains the burden of proof beyond a reasonable doubt. Okay. Now before you get there, you have to believe the confession was voluntarily taken. You have to believe what's in the confession, and it has to satisfy all those elements.

A. All right.

\*   \*   \*   \*   \*   \*

Q. I'm not asking what you would do, whether you would find the defendant guilty or not guilty. I'm not giving you a specific set of facts. I'm just asking, do you have any problem if that were a type of case?

A. No, sir.

After the prosecutor finished questioning the prospective juror, appellant's attorney asked a few questions:

Q. [Appellant's attorney] ... I have just a few other questions. The Prosecutor told you that they have the right to use a confession as evidence in a given criminal case. The law says that a confession can be used as evidence only if it was voluntarily taken by whomever took the confession.

You as a juror may be called on to make the determination of whether a confession was voluntary or not.

You as a juror may be in a situation to [sic] where you may be believe [sic] what a confession says. You may believe that that confession told the truth, but you may not feel that it was voluntarily given.

I mean, history is replete with individuals who may have told the truth; but it may have been forced out of them like, you know, beatings and things like that, just as far out examples.

Again, what I'm getting at, the law will say that you as a juror cannot consider the confession as any evidence whatsoever, even if you believe that it was true, unless you thought that it was voluntarily taken.

That is a proposition of law that the Judge will instruct you on. Do you feel that you as a juror if you were sitting in this case or any other case and you were confronted with a situation where you had to make a determination on a confession and even though you may think that the confession is a true statement but you don't think it's voluntarily taken, would you be able to follow the law then and throw that confession out even if it means no conviction results because of that, even if you thought it was true?

A. I think I would be swayed if I really thought it was true. I would have to have a better understanding of voluntary and non-voluntary, how it was differentiated.

Q. Voluntarily is another word that the Legislature didn't write a definition down. It's going to be up to the jury whether it was voluntarily given by a particular defendant or not.

A. I understand.

Q. Do you feel that you'd have a difficult time throwing a confession out that you thought was not voluntary if you also believed that it was true, that it gave a true statement?

A. I guess very truthfully, I'd have a hard time eliminating this input into the overall decision process.

\*   \*   \*   \*   \*   \*

MR. LEITNER [Appellant's attorney] Judge, we would at this time move for cause on the grounds set out in Article 35.16, Section c, Subsection 2, which is a bias or prejudice against any law applicable to the case to which the defendant is entitled to rely.

That's all we have on that.

THE COURT: Overruled.

After the challenge was overruled, the State did not question the prospective juror further. Appellant exercised a peremptory challenge on the prospective juror.

Certainly under Art. 35.16(c)(2), V.A.C.C.P., the defendant is entitled to have a juror excused under a challenge for cause when that juror has a bias against any phase of the law upon which the defendant is entitled to rely. Since appellant had given a confession in the instant case, he was entitled to rely on the law which requires jurors to ignore the confession if they deem it to have been given involuntarily. See Art. 38.22, Sec. 6, V.A.C.C.P. Thus, we must determine from the testimony whether prospective juror Bartlett evidenced a prejudice against the relevant law to the extent that his exclusion was required.

■ When considering a voir dire examination to determine whether a trial court improperly overruled a defendant's challenge for cause, we must accord deference to the trial court's rulings given its position to gauge the prospective juror's demeanor. *Bell v. State*, 724 S.W.2d 780 (Tex.Cr.App.1987). This deference is appropriate when the juror's answers conflict or the juror vacillates between different responses since the juror's demeanor and sincerity are important factors relative to deciding which answers to accept. Also, where a prospective juror is challenged on bias grounds, we must consider all of the answers given by the prospective juror. *Anderson v. State*, 633 S.W.2d 851 (Tex.Cr.App.1982).

When examined by appellant's attorney, Bartlett indicated that he would "have a hard time" eliminating the confession from consideration if that confession were deemed to have been given involuntarily. We considered a similar issue in *Phillips v. State*, 701 S.W.2d 875 (Tex.Cr.App.1985), when a prospective juror first stated that he would have to consider a confession

even if it were illegally obtained, then later reversed his position. We stated:

> Had prospective juror Pennington clearly and consistently stated that he could not disregard an illegally obtained confession, he would have been subject to a challenge for cause. See *Smith v. State*, 513 S.W.2d 823 (Tex.Cr.App.1974). When this voir dire is viewed in its entirety, however, it is apparent that after the law was explained to him, Pennington indicated that he would follow the law and disregard the confession. We conclude that Pennington was not biased against the law of the case and hold that the trial court did not err in refusing to strike him for cause.

In the case before us, the prospective juror, when questioned by the prosecutor, stated that he would have "no problem" with "that type of case", and later, when questioned by the appellant's attorney, stated that he would "have a hard time eliminating" an invalid confession.[11] He never clearly or consistently stated that he *could not* disregard such a confession. According deference to the trial court's ruling, upon the facts reflected by the record, we do not agree that prospective juror Bartlett manifested such a bias that the trial court's refusal to grant appellant's challenge for cause constituted reversible error. Appellant's third point of error is overruled.

■ In his fourth point of error, appellant contends that the trial court erred in granting the State's challenge for cause to prospective juror Rose Sheppard. During the voir dire examination, the following testimony was given:

> Q. [Prosecutor] That's fine. I understand you wouldn't be comfortable. You know, whether you're comfortable or not [with imposition of the death penalty], we need to find out how you feel about how the law is going to affect you.
>
> By that, I mean, in order to give the defendant the benefit of the doubt that new evidence may come up or what have

---

11. We perceive a difference between having a "hard time" following the law (but nonetheless still able to follow it) and being unable to follow the law. A bias or prejudice clearly arises from the latter. *Phillips, supra.*

you, is there no case in which you could assess the death penalty in an otherwise proper case?

A. [Sheppard] Well, maybe, if they just—well, I would say if they saw the person do it; but then I still would feel funny.

Q. Okay. Let me ask you this, would you have to have eyewitness testimony, that someone sees the defendant commit the offense?

A. Yeah.

Q. Is that what you're telling me?

A. Yes.

Q. Would you automatically have to have eyewitness testimony before you would find someone guilty of capital murder?

A. I would have to.

Q. You would in all cases?

A. Yes.

Q. In other words, if it was a circumstantial evidence case where no actual eyewitnesses saw what happened, you could never find anyone guilty of capital murder on that basis?

A. No.

Q. What do you base—do you just feel that the death penalty is not appropriate in any case whatsoever?

A. Well, I guess it's just the way I feel about it. I just wouldn't be comfortable.

After this exchange, appellant's attorney asked the witness a few questions:

Q. Going to this issue of eyewitness testimony, I hope you understand that you as a juror if you were chosen would be the sole and exclusive judge of whatever the facts might be.

Nobody can substitute themselves for you. You and the eleven other jurors would be the sole and exclusive judges of what the facts proved were, whether the witnesses were credible and how much importance or weight you would give to their testimony.

When it comes to the law, none of us here have any option on that. We're all bound to follow the law. You would receive the law from the Court, Judge Walker, who would prepare a written instrument which contained all the typed law that's applicable to this case.

Whether you agreed or disagreed with the law, you would by your oath be obligated to follow that law, whether you thought it was a good law or bad law or indifferent different law or it never should have happened or whatever.

You don't have any option. You have to follow the law. The same if I were on the jury. Nothing in that law is going to indicate to you that there must be an eyewitness to anything.

In fact, I would guess that probably the majority of crimes do not involve an eyewitness. Like, for example, burglary of a habitation, meaning a house, well, most of those things probably occur when nobody is home.

If you were a juror, would you let every person who was tied into the crime of burglary of a habitation go because nobody saw him do it?

[PROSECUTOR]: I object to that. It has no purpose for our purposes here. It has no basis at all. It's irrelevant and immaterial.

THE COURT: That's overruled.

Q. [DEFENSE ATTORNEY]: If the other facts show you, whatever the facts are, proved to you in your own mind, "Yeah, he did it; and nobody saw him do it," would you let him go because nobody saw him do it?

A. I don't think I would.

Q. You don't think you would. Can you give me a definite on that, yes or no? Would you let him go if you were otherwise convinced that he did it? Would you give me an answer on that?

A. It's kind of hard to say.

Q. Well, you understand that it's necessary for both sides, the State and the Defense, to know how you truly feel? We're not arguing with you. I'm trying to put you on the spot in the sense that I need an answer because I represent this man. Mr. Godwin represents the State.

We're entitled to your true feelings. We can't take a "maybe" or, you know, that sort of thing. We need to know positively. You have got a case where

you're otherwise convinced that he did it, but nobody saw him do it. Are you going to let him go?

Suppose, for example, in a hypothetical case that there was—

THE COURT: Let her answer the question.

[DEFENSE ATTORNEY]: Yes, sir.

A. (By the prospective juror) I'll say no.

Q. You would not let him go?

A. No.

THE COURT: Did you say you didn't think so?

PROSPECTIVE JUROR: Well, it's more no than yes, I guess.

THE COURT: Sustain your challenge, Mr. Godwin. You may go.

Appellant argues that exclusion of this juror on the State's challenge for cause was improper since although the witness initially stated that she could not convict a defendant without eyewitness testimony, she later indicated that she could do so. We note again that when passing on whether a juror was improperly excused for cause, we must accord due deference to the trial court's determination given its position to assess the juror's sincerity and demeanor. See *Clark v. State*, 717 S.W.2d 910 (Tex.Cr.App.1986), *McCoy v. State*, 713 S.W.2d 940 (Tex.Cr.App.1986) and *Wilkerson v. State*, 726 S.W.2d 542 (Tex.Cr.App. 1986). We have held that a juror is subject to challenge for cause if that juror is unable to return a guilty verdict when only circumstantial evidence is presented. See *Barnard v. State*, 730 S.W.2d 703 (Tex.Cr. App.1987). This fourth point of error is overruled.

■ In his fifth point of error, appellant contends that the trial court erred in sustaining the State's challenge for cause to prospective juror Sandra Simmons. The record does not clearly relect the basis for the State's challenge or the trial court's exclusion of Simmons, but it was apparently because the juror stated she had a bias against assessing the death penalty against a robber who "never even thought that they might kill somebody." Simmons admitted she did not "have a very high opinion of murder trials right now", because she was currently under State's subpoena to testify against her neighbor in a murder trial and did not "want to testify against her." Simmons stated her neighbor's "husband was beating her and she shot him. I would have done the same thing. I don't think she is wrong. * * * I think she's innocent. They're trying to get me to say she's guilty." The following testimony was given:

Q [BY PROSECUTOR]: Is that going to cause you such a problem that it might cause you to render something other than a fair and impartial verdict in this case?

A. * * * It just makes me think that people don't kill people 'cause they want to. I don't know. It makes me extremely confused in any case right now just trying to think what my next door neighbor might get.

Q. Are you telling me there is no murder case that the defendant did not want to kill the deceased?

A. No. I'm not saying [that]. * * *

Q. This defendant is charged with committing a murder in the course of committing a robbery. * * * And don't let me put words in your mouth. You said a few minutes ago you don't believe anyone actually thinks about killing someone when they go in to get the money or doing whatever they do. Is that what you said?

A. That's exactly what I said.

Q. Is that a fair statement?

A. I'm probably prejudiced, but that's what I feel. * * * If they make a habit out of it, if they rob all the time they probably do think, 'I'll just kill them if they give me a hard time'; but I don't think that young robbers ... [who] do it because they think they're cool even think about killing people. Like you see on TV, they believe they can get in there and get the money and get out and have a good time with it. I don't think they give it a thought unless they do it day in and day out.

Q. The law in the State of Texas is that if you commit a murder in the course of

committing or attempting to commit a robbery that that is capital murder.

Is it a fair statement that you have a bias or prejudice against this law?

A. Yes, I do. I told you that I do.

[PROSECUTOR]: We'll suggest there's cause, Your Honor.

THE COURT: Sustained. You may go. [Objection by Defense Attorney] * * *

[DEFENSE ATTORNEY]: At one point, you had said that you believe in the capital murder law and at another point you said you don't believe in the capital murder law. Let me just try to narrow you down on that issue.

A. I can help you real easy. *If somebody goes in with the purpose of killing* or say they go crazy and they kill ten people, just start shooting, they should be assessed the death penalty if it's proven.

Q. Let me stop you right there. Then, obviously, in your own mind there are fact situations in which the imposition of capital punishment would be correct?

A. Right.

Q. And there are fact situations where it would not be correct?

A. Right.

Q. And certainly you yourself as a juror wouldn't vote for the imposition of the death penalty unless you thought it was correct?

A. Right.

    \*    \*    \*    \*    \*    \*

Q. But you would leave your mind open to consider death penalty or no death penalty and let it be based on what those particular facts show in the particular case?

A. That's true.

At this point the State re-urged the challenge for cause.

A careful reading of Simmons' voir dire examination as a whole reveals her objection was to the death penalty in certain situations, not to the definition of capital murder as murder in the course of robbery, per se. Essentially, Simmons felt that only "pre-meditated" murders warrant capital punishment. If this is what the drafters of Art. 37.071(b)(1), supra, intended, the Legislature failed to say so; this Court has therefore held that pre-meditation is not necessary to imposition of the death penalty. See *Granviel v. State,* 552 S.W.2d 107 (Tex.Cr.App.1976); See also *Fearance v. State,* 620 S.W.2d 577 (Tex.Cr.App.1980).

We cannot say the trial court erred by excluding Simmons under these circumstances. Appellant's fifth point of error is overruled.

■ In his sixth point of error, appellant contends that the trial court erred in granting the State's challenge for cause to prospective juror Maxine Callender. The record shows the following testimony was given during the voir dire examination:

Q. [PROSECUTOR] In order to be eligible to sit on this jury, you have to be able to consider the entire range of punishment for the offense of murder. Many people feel like that they just couldn't do that. They couldn't consider five years for someone who has committed murder, or they couldn't consider life for anyone who committed murder.

My question to you, Mrs. Callender: Could you consider five years for the offense of murder for one who is convicted?

A. I don't think so, not five years.

Q. You feel that's just too light?

A. Uh-huh.

Q. Is that correct? There are no facts and no circumstances in your mind that would ever warrant under any circumstances in your mind you considering or assessing for that matter five years in the Texas Department of Corrections as a penalty for one who has been convicted of murder; is that correct?

A. Uh-huh.

Q. So you could not consider the minimum range for the offense of murder; is that correct?

A. (Juror nods head.)

Q. Knowing that you feel strongly about that, kowing [sic] that you couldn't—

A. That I feel strongly about.

Q. Nothing could be said that is ever going to change your mind, is it, Mrs. Callender.

A. No.

\*   \*   \*   \*   \*   \*

Q. [DEFENSE ATTORNEY].... Could you keep an open mind and consider the entire range, from five years to life, and make your verdict be dependent what [sic] the facts show to you?

A. I can keep an open mind, yes.

Q. Let me make sure the answer is the answer to my entire question. Can you keep an open mind to the consideration of the entire range of punishment and then make your particular punishment fit that crime, what you think is right for that crime?

A. I feel like I can, yes.

Q. Okay. Knowing what the entire range is, from five years to ninety-nine years or life?

A. Yes.

\*   \*   \*   \*   \*   \*

Q. [PROSECUTOR] We're talking about a situation where you have convicted someone of murder. In your mind, someone has been convicted of murder. Okay?

A. Okay. So, you're going to have to prove to me that they committed that?

Q. We're assuming that we have done that. Now, the range of punishment is from five to ninety-nine years or life. Can you ever consider five years as a proper punishment?

A. No.

Q. That's all I needed to know.

A. I mean, not for something that is what I consider murder.

Q. Mr. Leitner [appellant's attorney] asked if you could keep an open mind.

A. *I feel like I could keep an open mind. If somebody runs somebody off the road or pulls the plug [on a life support machine], to me, that's a different kind.* As far as I'm concerned, I can go home because you've confused me terribly. I could understand this gentleman over here.

Q. I suppose.

A. I'm being very honest.

Q. I'll try to be as clear with my questions and, hopefully, I won't be as confusing as I have been so far. I need to understand because I'm confused, too. You gave two different answers.

Can you ever consider the minimum of five years when you are convinced there was a murder?

A. Not of this type of murder, no; but I don't feel like that other is murder.

\*   \*   \*   \*   \*   \*

Q. ... The issue is whether you can consider the range of punishment for murder of five years up to ninety-nine or life, and you told me you couldn't consider the minimum; is that right?

A. Not for murder.

A prospective juror is subject to challenge for cause by the State under Art. 35.16(b)(3), supra, when the juror is biased against any phase of the law upon which the State is entitled to rely for conviction or punishment. This has been extended to situations where the juror is unable or unwilling to consider the minimum punishment. *Hogue v. State*, 711 S.W.2d 9 (Tex. Cr.App.1986), *Barrow v. State*, 688 S.W.2d 860 (Tex.Cr.App.1985), and *Phillips*, supra. See also *Nethery v. State*, 692 S.W.2d 686 (Tex.Cr.App.1985).

In the case before us, the prospective juror vacillated as to whether she could consider the full range of punishment. She changed her answer, then returned to her original position that five years imprisonment was not proper for a person convicted of murder, etc. According deference to the trial court's determination, we find that the prospective juror was properly excused for cause. Appellant's sixth point of error is overruled.

In his seventh point of error, appellant contends that the trial court committed reversible error in excusing for cause, over appellant's objection, venireman Billy Moton, who was not disqualified under Art. 35.16, V.A.C.C.P., or the Texas or Federal Constitutions. The record shows the following exchange took place during the voir dire examination:

Q. [PROSECUTOR] I'm talking about a situation now not that everything is proven to you beyond a reasonable doubt, but everything other than one element. The State didn't prove the date this offense occurred but you believe the defendant committed the crime and you believe in your heart and soul that he is a cold-blooded dangerous killer and that you just don't want him back out on the street but George and I didn't prove the date the offense occurred. If you follow your oath as a juror, you've got to find him not guilty. Some people say, a lot of people say, "I couldn't do that. I wouldn't want to be put in a position where I have to put a cold-blooded killer out on the streets just because the State failed to prove a technicality."

Do you see what I'm talking about? If you feel that way, we need to to [sic] know that. Do you feel like you could put a cold-blooded murderer out on the street on a technicality, or do you feel so strongly about it that you just wouldn't want to be called upon because you feel so strongly about it?

A. [Moton] (No response).

Q. I tell you what, we'll come back to you later on that and give you sometime to think about it. * * *

Q. Okay. Mr. Moton, we talked about the elements of the offense earlier. You recall a little earlier that we discussed that the state has to prove this defendant, Larry Wayne White, committed the crime, that it occurred on or about March 1st, 1977, and that while in the course of committing or attempting to commit the robbery of Elizabeth St. John, who is the victim, did intentionally cause the death of the victim by choking the victim with his hands and by stabbing the victim with a screwdriver.

As I told you earlier, if the State fails to prove any one of those elements, then you'd have to find this defendant not guilty. Now, many, many people feel that—say, we fail to prove up the date, as I discussed earlier. We failed to prove up this offense occurred March 1st, 1977; but you believe that Larry Wayne White was in the course of rob-

bing Elizabeth St. John, that he intentionally caused her death by choking her with his hands and by stabbing her with a screwdriver. You believe that he is a dangerous killer; but because the State did not prove the date the offense occurred, you'd have to find him not guilty because we didn't prove one of the elements.

My question to you, Mr. Moton, and the question I've asked many other jurors and many, many people feel they cannot be part of a situation like that, "I could not find a killer not guilty based upon a technicality," is that the way you feel?

A. Yes, sir.

\* \* \* \* \* \*

Q. Just to make sure that I understand and that the Defense attorneys understand, you're telling me that if the State fails to prove one of the elements of the offense, any one of elements [sic], but you still believe this defendant is guilty, you're going to find him guilty because you're not going to find him not guilty under a technicality?

A. That's true.

At this time, the trial court sustained the State's challenge for cause.

In his brief, appellant contends that the exclusion of juror Moton was improper because "[t]he State is not entitled to exclude prospective jurors on a misstatement of the law ...". Appellant argues that the State does not have to establish that the offense occurred on March 1st, 1977, but only that the offense occurred on or about that date. Thus, the prosecutor was misstating the law when he implied that a guilty verdict could not be had absent proof that the offense was committed on the exact date alleged.

Clearly the State would have to establish the allegation in the indictment that the offense occurred on or about March 1st, 1977. Moreover, appellant is correct in his assertion that the State would not be required to establish that the offense occurred on that date. Reading the entire voir dire, however, we find that the gist of

the State's questioning was whether the juror could, as a general proposition, find appellant not guilty on a technicality. In the initial questioning, the prosecutor did not mention a particular date. Later in the examination, the prosecutor did mention the March 1st date, but only in the context of releasing appellant on a technicality.

Given this reading of the examination, the State demonstrated that the juror would have difficulty following his oath and finding appellant not guilty if the State failed to establish one of the required elements. Even though a juror with this disposition would probably be an asset to the State, the juror was subject to challenge for cause under Art. 35.16, (b)(3), V.A.C.C.P. See generally *Gardner v. State*, 730 S.W.2d 675 (Tex.Cr.App.1987). According due deference to the trial court's determination, appellant's seventh point of error is overruled.

■ In his eighth point of error, appellant contends the trial court erred by admitting his written confession into evidence because the statement did not contain on its face matters required by V.A.C.C.P., Art. 38.22 Section 2.[12] This contention was raised both by written pre-trial motion and orally at trial.

Relevant to this contention, Art. 38.22, supra, provides:

Section 2. No written statement made by an accused as a result of custodial interrogation is admissible as evidence against him in any criminal proceeding unless *it is shown on the face of the statement that:*

(a) the accused, prior to making the statement, either received from a magistrate the warning provided in Article 15.-17 of this code or received from the person to whom the statement is made a warning that:

(1) he has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial;

(2) any statement he makes may be used as evidence against him in court;

(3) he has the *right to have a lawyer present to advise him prior to and during any questioning;*

(4) *if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning;*

(5) *he has the right to terminate the interview at any time;* * * * (emphasis added).

Appellant's Brief alleges the above emphasized portions of the statute did not appear on the face of the inculpatory statement which was taken by law enforcement officials in South Carolina.

The record reflects a mid-trial *Jackson v. Denno* hearing was conducted on the admissibility of appellant's confessions. Pursuant thereto and relevant to the contention on appeal, the trial court entered the following Findings of Fact:

6. [Officer] Kemp presented a form labelled "Miranda Warnings" to White and directed him to read it out loud. White read the warnings on that form out loud, then signed the form in the appropriate place to certify that he understood what the warnings said. The form, which was admitted as State's Exhibit 28, contained the following warnings:

1. You have the right to remain silent.

2. Anything you say can and will be used against you in a court of law.

3. You have the right to talk to a lawyer and have him present with you while you are being questioned.

4. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish one.

5. If you desire to make a statement or answer questions, you have the right to stop at any time.

7. [sic] Kemp said that the appellant did not indicate that the wanted to refrain from making a statement and did

---

**12.** At trial, appellant orally raised several other objections to the admissibility of the written statement, which are not advanced on appeal.

not indicate that he wanted to have a lawyer present. Kemp said White talked to him and Lt. Luke for about fifteen minutes. White never indicated that he wanted to terminate the interview.

Subsequently, in Finding No. 10, the trial judge made a detailed comparison of the statutory language in issue and the language used in the documents containing appellant's confessions. Thereafter, in the court's Conclusions of Law, the trial judge made the following observations:

5. * * * Both the page designated "Miranda Warning" and the pages containing the confession ... contain waivers. The court concludes that both Kemp and White regarded the "Miranda Warning" form as being incorporated into the written statements. The court concludes that there was adequate compliance with the statutory requirement of a facial showing of the recognition and waiver of rights.

6. The written warnings provided by Detective Kemp did not use wording identical to that of subsection (a) of section 2 of Article 38.22. As set forth in fact finding number 10 above, the language of the warnings and acknowledgements was *substantially equivalent* to the statutory language. The use of such substantially equivalent language constitutes adequate compliance with Section 2 of Article 38.22.

7. White understood the content of the confession and voluntarily signed all three pages in the statement. (Emphasis added).

Our independent review of the record reveals the trial judge's Findings are fully supported by evidence. We also agree, as a matter of law, that there was substantial compliance with Art. 38.22, supra.

In *Penry v. State*, 691 S.W.2d 636 (Tex.Cr.App.1985), we observed that warnings which convey on the face of a statement the exact meaning of the statute, but in slightly different language, are sufficient to comply with the requirements of the statute. See also *Eddlemon v. State*, 591 S.W.2d 847 (Tex.Cr.App.1979).

This eighth point of error is overruled.

■ Appellant's ninth point of error complains of the failure of the trial court to submit a specially requested instruction to the jury to the effect that they should find his inculpatory statement to be involuntary if they found a failure to comply with Art. 38.22, supra, in the respects addressed in the preceding point of error.

Sections 6 and 7 of Art. 38.22, supra, provide in pertinent part:

Sec. 6. In all cases where a question is raised as to the voluntariness of a statement of an accused, the court must make an independent finding in the absence of the jury as to whether the statement was made under voluntary conditions. * * * Upon the finding by the judge as a matter of law and fact that the statement was voluntarily made, evidence pertaining to such matter may be submitted to the jury and *it shall be instructed that unless the jury believes beyond a reasonable doubt that the statement was voluntarily made, the jury shall not consider such statement for any purpose nor any evidence obtained as a result thereof.*

Sec. 7. *When the issue is raised by the evidence, the trial judge shall appropriately instruct the jury, generally, on the law pertaining to such statement.*

Appellant was not entitled to the instruction contemplated by Section 6, supra, because no issue as to the voluntariness of his confession was made before the jury. *Jernigan v. State*, 661 S.W.2d 936 (Tex.Cr.App.1983); *Brooks v. State*, 567 S.W.2d 2 (Tex.Cr.App.1978). Furthermore, we cannot agree with appellant that the Section 7 language contemplates submission to the jury of any and every dispute as to the mechanical or technical requisites of Art. 38.22, Section 2, supra. Appellant is entitled to submission of the *general* issue of whether he was adequately warned, as that issue relates to the validity of his waiver of rights. However, as may be seen by our treatment of the preceding point of error, the law does not require exclusion of an inculpatory statement simply because the written words used to warn appellant were

not identical to those used in Art. 38.22, supra. This was the effect of the instruction requested by appellant. As such, it was an incorrect statement of the law and was appropriately refused by the trial court.

Appellant's ninth point of error is overruled.

■■■ By his tenth point of error, appellant complains of the trial court's failure to instruct the jury at the punishment phase that no adverse inference be taken from the defendant's failure to testify.

In *Brown v. State*, 617 S.W.2d 234 (Tex. Cr.App.1981), we held the trial court committed reversible error by refusing to charge the jury upon the defendant's failure to testify at the punishment stage of trial, over the accused's objection. However, in *Brown*, supra, no harm analysis was undertaken to determine whether the failure to so instruct the jury constituted reversible error.

In *Almanza v. State*, 686 S.W.2d 157 (Tex.Cr.App.1985) (Opinion on State's Motion for Rehearing), we construed V.A.C. C.P., Article 36.19 which provides reversible error standards for reviewing jury instructions on appeal. We stated there:

If the error in the charge was the subject of a timely objection in the trial court, then reversal is required if the error is 'calculated to injure the rights of defendant,' which means no more than that there must be *some* harm to the accused from the error. In other words, an error which has been properly preserved by objection will call for reversal as long as the error is not harmless. (emphasis original).

686 S.W.2d at 171.

We agree that the trial court erred in refusing to submit an instruction on the failure of appellant to testify at the punishment phase. However, under the standard as construed in *Almanza*, supra, the error was not reversible.

At the punishment phase, the State introduced evidence that appellant had strangled and suffocated to death an 80 year old woman in Orlando, Florida, a matter of days before he murdered Elizabeth St. John in Houston. According to a confession introduced at punishment, appellant was hired to do some yard work for the elderly Mae Bailey, who he subsequently choked with his hands and suffocated with a pillow. He then took an antique clock from her house, as well as $25.00, a suitcase full of papers and the victim's 1965 Plymouth Valiant, which he ultimately drove to Houston. Appellant sold the clock to an antique shop. He retained the papers, which included the registration to the Valiant.

Appellant confessed to the murder of Mae Bailey at the same time he confessed to the remarkably similar murder of Elizabeth St. John to law enforcement officials in Myrtle Beach, South Carolina. According to Mitchell Kemp, appellant at that time made no expression of regret for his deeds or remorse for his victims.

The State also introduced reputation for violence evidence from Ron Blazer, the former Chief of Detectives for the City of Lancaster, Ohio, Police Department. Also, detailed evidence that appellant was in the process of committing a burglary of Romondo's restaurant when he was arrested in Myrtle Beach was elicited. This evidence had been excluded by the trial judge at the guilt phase.

Appellant offered no evidence at the punishment phase.

In view of the evidence offered at punishment, coupled with the evidence adduced in the guilt/innocence stage, we cannot say the trial court's failure give the requested charge was calculated to injure the rights of the defendant in this case. Finding that this could not have contributed to the jury's answers to the special issues under the record before us, we conclude he suffered no harm from the omission of the requested charge.

Appellant's tenth point of error is overruled.

The judgment of conviction is affirmed.

DUNCAN, J., concurs in the result.

CLINTON, J., dissents.

TEAGUE, Judge, dissenting.

One of the ways that an individual commits the offense of capital murder is if the State properly alleges and proves beyond a reasonable doubt that he committed the offense of murder *and* also alleges and proves beyond a reasonable doubt that he committed the offense of robbery *and* also alleges and proves beyond a reasonable doubt a connection between the two, i.e., that the offense of murder was committed in the course of committing the offense of robbery. See V.T.C.A., Penal Code § 19.03(a)(2). As easily seen, the statutory requirement of conjunctive pleadings and establishment of conjunctive proof places an extremely heavy burden on the State because, even if it alleges and proves both a murder and a robbery, unless it proves that the murder was committed in the course of committing the robbery, it has not proved a capital murder. "A killing and unrelated taking of property do not constitute capital murder under § 19.03(a)(2)." *Ibanez v. State*, 749 S.W.2d 804, 807 (Tex.Cr.App.1986). In that instance, the offense is murder, not capital murder.

In this instance, given the facts of this cause, I find that the State has clearly failed to prove the offense of capital murder against Larry Wayne White, henceforth appellant. The majority opinion, however, erroneously believing that "A killing and unrelated taking of property does constitute capital murder under § 19.03(a)(2)", holds that the evidence is sufficient to establish that appellant committed the offense of capital murder. Because the evidence is clearly insufficient to establish that appellant committed the offense of capital murder, as alleged in the indictment, and as required by V.T.C.A., Penal Code, § 19.03(a)(2), and because the majority opinion erroneously holds to the contrary, I am compelled to file this dissenting opinion.

The question that must be answered, regarding appellant's first point of error, that the evidence is insufficient to establish all of the elements of capital murder, as alleged in the indictment, is not whether the evidence is sufficient to establish that appellant murdered his victim, Elizabeth St. John, or whether he committed the offenses of murder *and* theft, but, instead, is whether he murdered St. John in the course of committing the offense of robbery. As this Court recently pointed out, "A killing and unrelated taking of property do not constitute capital murder under 19.-03(a)(2)." *Ibanez*, supra. In sum, before the offense of capital murder can be found to exist in this cause, the evidence must show beyond a reasonable doubt that appellant not only murdered St. John but that he murdered her in the course of committing the offense of robbery. The term "in the course of committing or attempting to commit robbery" is not defined in the penal code. The term "in the course of committing theft" is defined in the penal code to mean "conduct that occurs in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of theft." See V.T.C.A., Penal Code, § 29.01(1).

One very simple way to make the determination whether the State proved beyond a reasonable doubt that appellant committed the offense of capital murder in this cause is to first make the determination whether he committed the offense of murder, and then next independently make the determination whether he committed the offense of robbery, and then independently make the determination whether there is a connection between the two offenses, i.e., whether he committed the offense of murder in the course of committing the offense of robbery. In its efforts to hold that the evidence is sufficient the majority opinion appears to employ the mortal or lethal assault first to elevate the theft of St. John's property to robbery and then to employ the mortal or lethal assault a second time to create the offense of capital murder. I have yet to find where the Legislature, in enacting § 19.03(a)(2), intended to sanction this kind of "double dipping." In this instance, however, the State in the indictment did not engage in "double dipping", in that the indictment clearly alleges that appellant committed the offense of capital murder when he murdered St. John in the

course of committing the offense of robbery; it is the majority opinion that in order to uphold the jury's verdict implicitly uses "double dipping."

In *Ibanez*, supra, Judge Campbell implicitly touched on the subject of "double dipping" when he clearly pointed out for the Court that before the offense of capital murder can be committed pursuant to 19.-03(a)(2), where the underlying offense is robbery, the State must present sufficient evidence that the murder occurred in the course of committing or attempting to commit the offense of robbery. Based upon the facts of that case, Judge Campbell stated for the Court the following: "Since the State alleged the same assaultive conduct for both the murder and and the robbery, it had to prove that the appellant intentionally strangled the deceased *with the intent to obtain control of the deceased's property*. (Emphasis in original.) A killing and unrelated taking of property do not constitute capital murder under 19.03(a)(2): the State must prove a nexus between the murder and the theft, i.e., that the murder occurred in order to facilitate the taking of the property. (Citations and footnote deleted.)". All of the statements are correct to the extent of the facts of that case. There, the indictment alleged that the defendant committed the offense of murder in the course of committing the offense of robbery, with the State additionally alleging the elements of the robbery offense. The State, however, when it introduced into evidence all of the defendant's confession, which contained statements therein that negated one element of the underlying robbery offense, itself actually nullified the robbery offense, and the Court so held. Thus, when this occurred, the State in *Ibanez*, supra, was thereafter left only with evidence that would support the offense of murder, and the Court so held, albeit implicitly. Here, although we do not have any such affirmative statements in appellant's confession, as we had in *Ibanez*, supra, that might negate any of the elements of the offense of robbery, we also do not have any evidence in appellant's confession that might supply the "nexus between the murder and the theft of St. John's automo-

bile", i.e., there is insufficient evidence that might establish that when appellant committed the murder of St. John he was then in the course of committing the offense of robbery, the object of which in this cause was clearly the theft of St. John's automobile. Thus, as far as the proof goes, there is no substantial difference in meaning between what occurred in *Ibanez*, supra, and the facts of this cause.

I find it rather amazing, given the fact that since the present Penal Code became effective January 1, 1974, and the fact that this Court since then has been confronted with hundreds of robbery convictions and capital murder convictions where the underlying offense is robbery, that the author of the majority opinion cannot cite at least one "white horse" case, or even one that is slightly greyish in color, that will support his conclusion that the evidence is sufficient to sustain appellant's conviction for committing the offense of murder in the course of committing the offense of robbery.

Is this perhaps because the author of the majority opinion's research, like mine, has yet to reveal a similar factual situation where this Court affirmed a like conviction for capital murder? Amazingly, I do not find where the majority opinion ever mentions *Ibanez*, supra, which may be the one decision of this Court that is closest in point to the facts of this case.

I also find it rather interesting, in disposing of appellant's first point of error, given what he states therein, that the author of the majority opinion never mentions the State's brief that was filed by Hon. Winston Cochran, Jr., who represents the Great State of Texas in this cause. I find that Cochran spends more time arguing in his brief on appeal why the State should be entitled to retry appellant for the offense of murder than he does defending the jury's verdict finding appellant guilty of capital murder. However, given the facts that Cochran had to work with in preparing his appellate brief, I, for one, can easily understand why he almost confesses reversible error on behalf of the State, and why counsel for appellant, Hon. Carolyn

Garcia, because of the facts that the State presented in the trial court, in this instance has the better position in arguing that the evidence is insufficient to sustain an essential element of the offense of capital murder.

Cochran concedes in his appellate brief that "The keystone of the State's case was the appellant's confession ..." (Page 4, State's Brief.) Because of its importance, I attach a copy of appellant's confession to this opinion as "Appendix A" so that the reader might better understand why I take the stand that I do on appellant's first point of error.

The record reflects that appellant was found guilty of capital murder by the jury on an indictment that charged, *"while in the course of committing and attempting to commit robbery,* [he] intentionally caused the death of Elizabeth St. John, hereafter styled the Complainant, by choking her with his hands and stabbing her with a screwdriver." (My emphasis.) It was thus incumbent upon the State to establish, beyond a reasonable doubt, not only that appellant intentionally committed the offense of murder of St. John but that he also committed the offense of murder of St. John *while in the course of committing the offense of robbery.* Unfortunately for the State, unless one desires to engage in some sort of "double or triple dipping", the evidence is simply insufficient to support the conclusion that appellant is guilty of capital murder, as alleged in the indictment.

As far as I can determine, the reason that the majority opinion gives for overruling appellant's first point of error is because it finds that the evidence established that appellant was shown to have been in recent possession of St. John's automobile when he was arrested in another state several days after the murder, and also finds that after he murdered St. John appellant did not flee in his personal motor vehicle, but instead fled in her motor vehicle. This might be sufficient to show murder *and* theft, but it most certainly does not support the conclusion that appellant mur-

dered St. John *in the course of committing the offense of robbery.*

Cochran also concedes in his brief that "appellant's confession did not state verbatim that [the items found in the deceased's motor vehicle, a stereo, a lamp, some cash, and some jewelry, which were recovered after he was arrested,] belonged to [the deceased]." (Page 5 of State's Brief.) The State further concedes that it did not have any witness testify at trial and identify those items as belonging to the deceased. (Page 5 of State's Brief.) There is also no evidence that any item of property found in the car was shown to be missing from the deceased's apartment after her body was found. Contrary to the majority opinion's insinuation, there is no direct evidence that might support the finding that appellant was shown to have unlawfully taken the deceased's automobile, although there is evidence that six days later when he was arrested in South Carolina he was located near the deceased's automobile and had keys to the car in his pocket. However, there is no evidence that might reflect or indicate when appellant received or may have gotten the keys to the car, nor is there any evidence that might reflect or indicate that this was the only set of keys that existed when appellant was arrested near the deceased's car.

I find that in deciding appellant's first point of error, what is undisputed is critical to the issue.

The following is not in dispute, although I do find that a rational trier of fact would be warranted in not giving many of the items any credence whatsoever: Prior to her death, St. John invited appellant inside her apartment; there were no signs of forced entry into the apartment or signs of a struggle inside of the apartment; after being invited inside of the apartment, appellant had consensual sexual intercourse with St. John while she was still alive; when St. John's body was found, several pieces of jewelry that were on the body's hands and attached to its ears had not been disturbed; money was also found in her purse; appellant's prints did not match any of the prints taken from inside of the apart-

ment; when arrested, appellant was not driving the deceased's automobile, but it was shown that appellant was arrested near the door of an empty building, with a set of keys to St. John's vehicle in his pants pocket, and St. John's vehicle was parked nearby; appellant never admitted that he killed St. John while in the course of taking her vehicle; nor did he ever admit that the killing had anything whatsoever to do with his taking St. John's vehicle, nor is there any evidence that might reflect or indicate that prior to appellant's entry into St. John's apartment he planned to commit either theft, robbery, or any other offense, in particular, there is no evidence that when he entered St. John's apartment he then planned to murder her and then steal her motor vehicle.

One of the ways that the offense of capital murder may be committed is if a person commits the offense of murder *while in the course of committing or attempting to commit the offense of robbery.* See V.T.C.A., Penal Code, § 19.03(a)(2). Also see *Ibanez v. State,* supra; *Fierro v. State,* 706 S.W.2d 310 (Tex.Cr.App.1986); *Cannon v. State,* 691 S.W.2d 664 (Tex.Cr.App.1985); *Riles v. State,* 595 S.W.2d 858 (Tex.Cr.App.1980). One of the ways that the offense of robbery may be committed is if a person, in the course of committing theft, *and* with intent to obtain or maintain control of the property, intentionally, knowingly, or recklessly causes bodily injury to another. See V.T.C.A., Penal Code, § 29.02(a)(1). "In the course of committing theft" is defined as "conduct that occurs in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of theft. See V.T.C.A., Penal Code, § 29.01(1). Also see *Rohlfing v. State,* 612 S.W.2d 598 (Tex.Cr.App.1981). "Bodily injury" is defined to mean "physical pain, illness, or any impairment of physical condition." See V.T.C.A., Penal Code, § 1.07(a)(7). Obviously, a person who has been murdered has sustained "bodily injury". However, "A killing and unrelated taking of property do not constitute capital murder under 19.03(a)(2)." *Ibanez,* supra.

The issue as I see it is whether the evidence that was presented by the State to the jury will support the jury's implicit finding that the State proved beyond a reasonable doubt that appellant caused the death of the deceased *while in the course of effectuating the theft of her motor vehicle* or caused her death *while in the immediate flight from the scene of the theft.*

This Court has previously stated the following: "This new definition of robbery proscribes the use of violence not only in the taking of the property, but also in the immediate flight of the thief to keep the property." *Lightner v. State,* 535 S.W.2d 176 (Tex.Cr.App.1976). Also see *Brown v. State,* 535 S.W.2d 640 (Tex.Cr.App.1976). Thus, under the definition of "in the course of committing theft", a person commits the offense of robbery even if he is not seen committing or attempting to commit the offense of theft, provided that he assault his victim or another *while in immediate flight after the attempt or commission of theft.* It should therefore be clear that a thief does not become a robber unless in effectuating the theft, *during the course of committing the theft, or in the immediate flight therefrom,* he intentionally, knowingly, or recklessly causes bodily injury to another. See *Lightner,* supra; *Brown,* supra. Thus, what is missing in this cause, evidence wise, is the connection between the deceased's death and the taking of her vehicle that might make the offense capital murder. Under our law, even if it is established that the appellant committed the murder, if there is no evidence or insufficient evidence that the murder was committed in the course of committing or attempting to commit the offense of robbery, it is not capital murder. See § 19.03(a)(2).

In this instance, there is no evidence that anyone witnessed appellant committing the offense of theft of St. John's vehicle, either before, during, or after the murder. Thus, the crucial question becomes: Is there any evidence to support the jury's implicit finding that appellant committed the offense of murder "while in immediate flight after the attempt or commission of theft of the de-

ceased's motor vehicle." Given the evidence that was presented to the jury in this cause by the State, the answer should be obvious to almost anyone: "OF COURSE NOT!!!!!"

The only evidence that the State had to show that appellant murdered St. John in the course of committing or attempting to commit the offense of robbery was through appellant's confession. However, all that appellant's confession shows is that after he was invited inside of St. John's apartment, he had consensual sexual intercourse with her, killed her, after which he left her apartment, took her car, and was later arrested in another state. "A killing and unrelated taking of property [, however,] do not constitute capital murder under 19.-03(a)(2)." *Ibanez*, supra.

In this instance, given the facts that the trier of fact was presented, there is sufficient evidence that would have permitted the jury to find that appellant committed the theft of St. John's automobile. See *Hardesty v. State*, 656 S.W.2d 73, 77 (Tex. Cr.App.1983). Also see *Browning v. State*, 720 S.W.2d 504 (Tex.Cr.App.1986), and *Aguilar v. State*, 682 S.W.2d 556 (Tex.Cr. App.1985).

However, the inquiry does not stop at this point because, in order to establish the offense of capital murder, the State's evidence also had to show, not only that appellant stole St. John's vehicle, but that he committed the murder of St. John *in the course of committing or attempting to commit the offense of robbery*. What is missing from this cause, evidence wise, once again, is evidence that would establish that appellant murdered St. John *and* that he killed her in the course of committing or attempting to commit the theft of her automobile. Once again, I emphasize: "A killing and an unrelated taking of property do not constitute capital murder under 19.-03(a)(2)." *Ibanez*, supra. Thus, the mere fact that the State established a killing *and* a theft will not, standing alone, establish capital murder.

The majority opinion relies upon *Banks v. State*, 643 S.W.2d 129 (Tex.Cr.App.1983), as authority for its holding that the evi-

dence is sufficient to establish that appellant murdered St. John while in the course of committing the offense of robbery. The majority opinion also tells us: "See also *Fierro v. State* [, 706 S.W.2d 310 (Tex.Cr. App.1986) ]; and *Russell v. State*, 665 S.W.2d 771 (Tex.Cr.App.1983)", which I will do.

Given the distinction between the facts in this cause and the facts in *Banks*, supra, *Banks*, supra, clearly is no authority for the majority opinion's holding.

The facts set out in *Banks*, supra, reflect that the murder of the defendant's victim occurred in Bowie County. The facts also show that the defendant made inculpatory admissions to another individual, apparently not too long after the killing, that in the course of drinking beer with the deceased he "decided to kill the [deceased] for the hell of it *and take his automobile to Dallas*", (my emphasis), which the opinion states is just exactly what he did. Given the quoted admission, it should be clear to almost anyone that, just like the defendant stated, he first intended to kill the deceased and then take his automobile, which is exactly what he did. In any event, the defendant's admission made it clear that he killed his victim either in the attempt to take his car, during the commission of the theft, or in immediate flight after the commission of the theft of the car. Given the definition for "in the course of committing theft", how the author of the majority opinion can state that "Banks' statement . . . was unclear in the sense that Banks did not state that his intent to take his victim's vehicle had been formed by the time he killed him" clearly escapes me. By his admission, the defendant clearly telegraphed his intent to the world.

*Fierro*, supra, is also distinguishable from this cause. There, the facts clearly show that the murder occurred during the course of committing a robbery. The defendant, while riding in his victim's taxicab, first shot his victim in the back of the head and then took the victim's taxicab as well as his personal property. Clearly, this showed, at least circumstantially, a murder

committed in the course of committing a robbery.

*Russell,* supra, is also distinguishable from this cause because there the facts clearly demonstrated that the murder occurred during the commission of a robbery, i.e., the murder occurred either in an attempt to commit theft, during the commission of the theft, or in immediate flight after the attempt or commission of theft. A clear reading of *Russell,* supra, makes it clear to me that the State established that the killing was related to the taking of the deceased's property.

In this cause, the following critical question must be asked: If there had been no murder, would the facts support a finding that a robbery was committed? Of course not. In the paradigm case, where the defendant goes into a convenience store and thereafter in robbing or attempting to rob the clerk he murders the clerk, if the robber had not killed his victim, would he still be guilty of the robbery? Of course. But, if *the State's evidence* shows that the robber went into the store, killed the clerk, and thereafter, believing that the clerk no longer needs the money in the cash register, takes it, is that capital murder? Of course not. Why? Because the State's evidence itself disproved the element that the murder was committed in the course of committing the theft. *Ibanez,* supra. If the State's evidence shows that the defendant went to his victim's residence on foot, and saw his victim's car parked in front of the residence, and thereafter went inside the residence and killed his victim, and thereafter took his victim's car, is that capital murder? Of course. A reasonable inference could be drawn from those facts that the defendant murdered his victim while in the course of committing the offense of robbery, i.e., that in the course of committing theft of his victim's vehicle he murdered his victim. But if the defendant drove his car to his victim's residence, and thereafter killed his victim, and then left in his victim's car rather than his own, unless it was shown that his vehicle had become disabled, it would not be a reasonable inference to infer that he murdered his victim so that he could take his victim's car. And

that is this case. Let us return to *Ibanez,* supra.

In *Ibanez,* supra, the facts showed that the deceased, a 38 year old male homosexual, "picked up" the 17 year old defendant, who was also a homosexual, and the two later "retired" to the deceased's apartment, where the two agreed to engage in homosexual activity, with the deceased agreeing to become the "woman" and the defendant agreeing to become the "man". However, the deceased apparently reneged on the agreement, and, in violation of the agreement, attempted to have the defendant be "the woman" and give him a "blow job". The defendant objected, which resulted in a struggle, with the defendant, acting out of anger and fear, strangling the deceased to death. The defendant then left the deceased's apartment. Thereafter, he took the deceased's automobile. When the deceased's body was found, it had on it two gold chains, a bracelet, and a watch. The defendant stated in his confession that his taking of the deceased's automobile was only "incidental." The deceased's vehicle was found in Juarez, Mexico, locked, with the keys in the ashtray.

This Court held that the evidence was insufficient to establish the offense of capital murder, and stated: "A killing and unrelated taking of property do not constitute capital murder under 19.03(a)(2): the State must prove a nexus between the murder and the theft, i.e. that the murder occurred in order to facilitate the taking of the property." "Since the State alleged the same assaultive conduct for both the murder and the robbery, it had to prove that the appellant intentionally strangled the deceased with the intent to obtain control of the deceased's property. (Footnote omitted.)" (807).

In rejecting the State's contention that because the evidence established that the deceased normally kept a jewelry box in his dresser drawer, and a jewelry box was found in the deceased's vehicle, which automobile had been taken by the defendant after he had killed the deceased, this was sufficient to establish the offense of robbery, this Court stated that "the jewelry

box found in the deceased's vehicle was never identified as being the deceased's jewelry box; moreover no one ever identified the contents of the jewelry box to establish if any jewelry was missing, or if any of it belonged to the deceased." The opinion also pointed out that the jewelry was turned over to relatives of the deceased.

In reference to the fact that the defendant took his victim's car after he killed his victim, the Court in *Ibanez*, supra, pointed out that the defendant Ibanez had stated in his confession, which the State introduced into evidence without any deletions, that he killed the deceased out of anger and fear, and not in order to obtain and maintain control of the car. This Court held that the State was bound to disprove this exculpatory statement, and found that it didn't. Although in this cause appellant in his confession admits taking St. John's car, there is no admission that might reflect or indicate that he murdered St. John "while in the course of committing the offense of robbery."

The Court in *Ibanez*, supra, implicitly at least, asked itself the following question: If the deceased had not been murdered, would the evidence have sustained a conviction for the offense of robbery, and answered the question in the negative. We should ask the same question in this cause.

Let us carefully read appellant's confession, see "Appendix A", in order to make the determination whether, if St. John had not been murdered, the State proved a robbery. Let us then carefully read appellant's confession in order to make the determination whether it states an admission that appellant murdered St. John in the course of committing the theft of her car. Based upon appellant's confession, the questions should be answered in the negative because nowhere in his confession does

appellant admit that he killed St. John "to obtain and maintain control of her car", and nowhere in his confession does appellant admit that the murdered St. John in the course of committing a robbery.

The facts of this cause simply do not give rise to the reasonable inference that appellant caused the death of St. John while committing or attempting to commit the theft of her motor vehicle, which in this instance is a necessary and critical element of the offense of capital murder. In sum, given the facts of this cause, the evidence is clearly insufficient to sustain the allegation that appellant caused the death of St. John while committing or attempting to commit the offense of theft of her car.

The majority opinion states: "We hold a rational trier of fact could find appellant's murder of his victim occurred 'during the course of robbery' beyond a reasonable doubt." Given the facts in this record, and the definition of "in the course of committing theft", I find that that dog just won't hunt, and that only an irrational, not rational trier of fact, would have found appellant guilty of capital murder.

By this dissenting opinion I am not saying that the State could not have established a capital murder case against appellant. I am simply saying that if the State wants to convict an individual of capital murder, and subject that individual to a premature death, it should first be required to establish with proof, beyond a reasonable doubt, the elements of the offense of capital murder, and should not rely upon either an irrational jury's finding or this Court's reluctance to reverse a capital murder conviction and the sentence of death to prove its case.

For the foregoing reasons, I respectfully dissent.

# APPENDIX A

State of South Carolina )

COUNTY OF HORRY

AFFIDAVIT OR STATEMENT.

Voluntary Statement (under arrest)

Date ___March 8, 1977___ time ___11:30 A.M.___ place ___Myrtle Beach Police Dept.___

I, ___LARRY WAYNE WHITE___, am ___26___ years of age and my address

is ___Airline Apartments, #24, Houston, Texas___, I have been advised and duly warned by

___Glenn Kemp___, who has identified himself as ___a Police Officer___,

of my right to advice of counsel, entitled to a preliminary hearing, before making any statement, and that I do not have to make any statement at all, nor incriminate myself in any manner.

I hereby expressly waive my right to the advice of counsel, and voluntarily make the following statement to the aforesaid person or persons knowing that any statement I make may be used against me on the trial or trials for the offense or offenses concerning which the following statement is herein made.

I declare that the following statement is made of my own free will without promise of hope or reward, without fear or threat of physical harm, without coercion, favor or offer of favor, without leniency, by any person or persons whomsoever.

The car that I was in this morning came from Houston, Texas. I took it from the Airline Apartments in Houston, after I choked Ms. Elizabeth St. John and stabbed her in the back with a screwdriver. I was drinking at the time, and she had offered to give me a bonus of $20.00 for painting work I had done. I met Ms. St. John through the manager of the apartments when I was working at the apartments. I was in Houston for about a week before I killed her. I killed Ms. St. John a week ago Tuesday; it has been one week ago today, and I left the screwdriver there. We were in the livingroom of her apartment watching television, and we had had intercourse on the couch before I killed her. I would say that she was 52 to 56 years old maybe. I did not rape her, she consented. After I choked her and stabbed her, I left Houston that night and I took the stereo that is in the car now, $45-$50, a lamp, and the jewelry that is in the toolbox on the front seat. I got to Myrtle Beach last night between 6:00 and 6:30 P.M. and went to Dorothy's Green Bar or Green Lounge. When the police got me, I was breaking in the side door of the restaurant. I needed some money, and I didn't know that they were closed down.

-----END OF ONE-PAGE STATEMENT-----

S-X-31A
T.S. 8/21/84

Witnesses:

___M. Glenn Kemp___

___E. Kimberloke___

___Larry Wayne White___
Signature of maker of affidavit

SWORN to before me this the ___ day of ___,

19__
Notary Public, S. C. ___

This is to certify that I have read the above statement or same has been read to me and I have been given copy of same as of this date

___Larry Wayne White___
Signature of maker of affidavit

NOTE: TO MAGISTRATES AND OFFICERS Please secure affidavit in triplicate giving defendant or witness a copy and taking receipt holding the original and sending copy to the Solicitor.

J. M. Long, Jr., Solicitor 15th Circuit
Conway, South Carolina
Telephone: Office 248-9423