Luis Alberto ULLOA, Appellant,

v.

The STATE of Texas, Appellee.

No. 08–93–00154–CR.

Court of Appeals of Texas,
El Paso.

Feb. 16, 1995.

Discretionary Review Refused June 7, 1995.

Charles Louis Roberts, El Paso, for appellant.

Jaime E. Esparza, Dist. Atty., El Paso, for State/appellee.

Before BARAJAS, C.J., and LARSEN and McCOLLUM, JJ.

## OPINION

BARAJAS, Chief Justice.

Luis Alberto Ulloa appeals his conviction for the felony offense of burglary of a habitation, enhanced by two prior felony convictions. Trial was by jury. Upon conviction, punishment was assessed at confinement in the Institutional Division of the Texas Department of Criminal Justice for a term of 45 years. We reverse the judgment of the trial court.

## I. *SUMMARY OF THE EVIDENCE*

In 1992, Ernesto Sosa was employed as the driver of a delivery van for an east El Paso flower shop. He made a habit of driving by his nearby suburban home while making deliveries because he was concerned about recent burglaries in the area. Fortunately, Sosa made one such trip by his house on the morning of December 9, 1992, at which time he observed an unfamiliar car in his driveway and saw a stranger standing near the front door of his house. Because the stranger turned to look at Sosa as he approached, Sosa continued past his house, making a U-turn and parking in the street several houses away to monitor the situation. After some three minutes Sosa, unable to see the front door from his position, again approached his house in the van only to find that the stranger was no longer standing at the doorway. Sosa then made another U-turn and pulled into his driveway so as to block the stranger's car with his van.

Sosa found the front door locked and untampered with, but noticed footprints in the dirt of his unlandscaped front yard. Sosa followed the footprints around the side of the house and peered over the fence to see that they led to the garage door in the backyard. Sosa then returned to the front door and quietly unlocked and opened it. He there discovered his toolbox, which had previously been left in the garage on the living room floor. Sosa then took a screwdriver and wrench from the toolbox and proceeded to search for an intruder. A noise attracted his attention and Sosa turned in time to see the stranger escaping through a bedroom window, although Sosa saw only the man's leg, which was clothed in bleached jeans and a cowboy boot. Sosa rushed back to the front yard to see Appellant entering his car. Sosa, screwdriver and wrench still in hand, at least twice instructed Appellant to exit the vehicle. When Appellant did not comply, Sosa went to the open driver's side door and closed it against Appellant's protruding leg, pinning Appellant. Sosa removed the keys from the ignition, instructed Appellant to remain in the car, and went to the house across the street to call police, visually monitoring Appellant all the while.

El Paso Police Officer Jorge Perez arrived within a minute. Perez handcuffed Appellant and secured the residence, limiting access to police personnel and Sosa when escorted by police. In the backyard, Perez found an open bedroom window with a bro-

ken pane of glass and a rock lying inside the bedroom. Perez then accompanied Sosa throughout the house to determine whether any property was missing or had been moved. In addition to the toolbox, Sosa found many items not located as they were when he left for work, including clothes in disarray in a bedroom, a television on a bed, a cassette player on the floor of a bedroom, two open jewelry boxes with jewelry strewn around them in another bedroom, and jewelry next to a rock wall in the yard. Police later matched the footprints near the garage door and near the jewelry with Appellant's boots.

## II. *DISCUSSION*

Appellant attacks his conviction in ten points of error. In his second through seventh points of error, Appellant claims the trial court erred in refusing his requested "no-adverse-inference" punishment instruction regarding his failure to testify. Appellant argues the trial court's action abridged the rights guaranteed him by the Fifth Amendment to the United States Constitution. We agree.

■ It is axiomatic that a criminal defendant cannot be compelled to be a witness against himself. U.S. CONST. amend. V, cl. 3. A defendant's right not to testify continues beyond conviction until after a defendant has been sentenced. *Beathard v. State*, 767 S.W.2d 423, 432 (Tex.Crim.App.1989); *Brown v. State*, 617 S.W.2d 234, 237 (Tex. Crim.App.1981). Further, a defendant has a right to a no-adverse-inference instruction, which concerns the fact a defendant elects not to testify, at the punishment stage of a trial. *White v. State*, 779 S.W.2d 809, 828 (Tex.Crim.App.1989), *cert. denied*, 495 U.S. 962, 110 S.Ct. 2575, 109 L.Ed.2d 757 (1990); *Beathard v. State*, 767 S.W.2d at 432; *Brown v. State*, 617 S.W.2d at 238.

■ At the outset, we must determine whether Appellant either objected to the failure to include a no-adverse-inference instruction or, in the alternative, made a proper request to add such an instruction. A defendant waives the right to a no-adverse-inference instruction unless either a request is made to the trial court to add the instruction to its charge at the punishment stage or an objection is made to the omission of such instruction. *See Brown v. State*, 617 S.W.2d at 238.

The record in the instant case demonstrates that Appellant orally requested such an instruction. Prior to the submission of the charge to the jury, Appellant's trial attorney made the following objection to the proposed charge on punishment:

DEFENSE ATTORNEY: Also, Judge, we would request the following instruction[:]

> Our law provides that a Defendant may testify in his own behalf if he elects to do so. This, however, is a privilege accorded a Defendant, and in the event he elects not to testify, that fact cannot be taken as a circumstance against him. In this case the Defendant has elected not to testify, and you are instructed that you cannot and must not refer or allude to that fact throughout your deliberations or take it into consideration for any purpose whatsoever as a circumstance against the Defendant.

STATE'S ATTORNEY: Your Honor, may I respond? I think that's more appropriate during the first stage of the trial.

THE COURT: The jury has been so instructed. Your objection is overruled.

■ In ruling on Appellant's request, the trial court referred to the charge given the jury at the guilt-innocence phase of trial, which did include a no-adverse-inference instruction. The charge given the jury at the punishment phase did not include such an instruction. Although not phrased as an objection, we find the oral request sufficient to preserve error, especially since the trial court characterized Appellant's statement as an objection and expressly ruled on it. *See* TEX.CODE CRIM.PROC. art. 36.15 (Vernon Supp.1994) (deeming dictation of requested instruction to court reporter sufficient to preserve error).

■ Finding error, we must now determine whether such error is reversible. We reverse upon a finding of error, unless we determine beyond a reasonable doubt that the error made no contribution to Appellant's

punishment. TEX.R.APP.P. 81(b)(2). Since this is a case of charging error with timely objection, we reverse only if the error was calculated to injure the rights of Appellant, which means there must be some harm to the accused from the error. *See White v. State,* 779 S.W.2d at 828 (citing *Almanza v. State,* 686 S.W.2d 157 (Tex.Crim.App.1984)).

■■■ We begin with a cursory examination of the importance of the right at issue. The Fifth Amendment privilege against compulsory self-incrimination reflects our collective unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury, or contempt, our sense of fair play that compels us to require the government in its contest with the individual to shoulder the entire burden without the benefit of evidence from the defendant's own mouth, our respect for the inviolate private enclave where a private citizen may lead a private life, and our realization that the privilege, while sometimes a shelter to the guilty, is often a protection to the innocent. *Murphy v. Waterfront Comm'n,* 378 U.S. 52, 55, 84 S.Ct. 1594, 1596, 12 L.Ed.2d 678 (1964). The Fifth Amendment attempts to secure the foregoing interests by empowering a criminal defendant to elect not to testify, and by prohibiting the State from exacting a price for exercising the privilege. *Griffin v. California,* 380 U.S. 609, 614, 85 S.Ct. 1229, 1232, 14 L.Ed.2d 106 (1965). The omission of a no-adverse-inference punishment instruction attaches such a price to the exercise of the privilege because "the members of a jury, unless instructed otherwise, may well draw adverse inferences from a defendant's silence." *Carter v. Kentucky,* 450 U.S. 288, 301, 101 S.Ct. 1112, 1119, 67 L.Ed.2d 241 (1981). In *Carter,* the United States Supreme Court made clear that a defendant's constitutional right to remain silent is not to be trivialized:

> We have repeatedly recognized that instructing a jury in the basic constitutional principles that govern the administration of criminal justice, is often necessary. Jurors are not experts in legal principles; to function effectively, and justly, they must be accurately instructed in the law. **Such instructions are perhaps nowhere more important than in the context of the Fifth Amendment privilege against compulsory self-incrimination,** since [t]oo many, even those who should be better advised, view this privilege as a shelter for wrongdoers. They too readily assume that those who invoke it are ... guilty of crime.... And, as the Court has stated, we have not yet attained that certitude about the human mind which would justify us in ... a dogmatic assumption that jurors, if properly admonished, neither could nor would heed the instructions of the trial court....
>
> A trial judge has a powerful tool at his disposal to protect the constitutional privilege—the jury instruction—and he has **an affirmative constitutional obligation** to use that tool when a defendant seeks its employment. No judge can prevent jurors from speculating about why a defendant stands mute in the face of a criminal accusation, but a judge can, and must, if requested to do so, use the unique power of the jury instruction to reduce that speculation to a minimum.
>
> · · · · ·
>
> The freedom of a defendant in a criminal trial to remain silent unless he chooses to speak in the unfettered exercise of his own will" is guaranteed by the Fifth Amendment and made applicable to state criminal proceedings through the Fourteenth. And the Constitution further guarantees that no adverse inferences are to be drawn from the exercise of that privilege. Just as adverse comment on a defendant's silence cuts down on the privilege by making its assertion costly, the failure to limit the jurors' speculation on the meaning of that silence, when the defendant makes a timely request that a prophylactic instruction be given, exacts an impermissible toll on the full and free exercise of the privilege. Accordingly, we hold that **a state trial judge has the constitutional obligation, upon proper request, to minimize the danger** that the jury will give evidentiary weight to a defendant's failure to testify.

*Carter v. Kentucky,* 450 U.S. at 302–05, 101 S.Ct. at 1120–21 (emphasis added) (footnote, citations, and internal quotations omitted),

*quoted in Castaneda v. State,* 852 S.W.2d 291, 298–299 (Tex.App.—San Antonio 1993, no writ) (Chapa, J., dissenting).

In *Brown v. State,* 617 S.W.2d at 234, the Court of Criminal Appeals recognized *Carter's* unequivocal mandate when it stated:

> We hold that where a request is made to the trial court to add to its charge at the punishment stage of the trial an instruction on the failure of the defendant to testify, or an objection is made to the omission of such charge, **it is reversible error** if the trial court fails to honor that request or objection because we find that "members of the jury, unless instructed otherwise, may well draw adverse inferences from a defendant's silence," at the punishment phase of the trial, just as they could from the defendant's silence at the guilt-innocence stage of the trial. "No judge can prevent jurors from speculating about why a defendant stands mute ..., but **a judge can, and must,** if requested to do so, use the unique jury instruction to reduce that speculation to a minimum." *See Carter,* ....

*Id.* 617 S.W.2d at 238 (emphasis added) (quoting *Carter v. Kentucky,* 450 U.S. at 301, 303, 101 S.Ct. at 1119, 1120). We are cognizant of that fact that, despite the apparent clarity of the Supreme Court's pronouncement that a state trial court is bound by the federal Constitution to give the jury a no-adverse-inference punishment instruction, and despite the manifestation of its own proper understanding of this requirement and its importance, the Court of Criminal Appeals applied a harmless error analysis to this issue in *White v. State,* 779 S.W.2d at 809 [1]. *White* finds that the defendant's constitutional rights were trampled by the erroneous omission of the appropriate punishment instruction, yet deems the error harmless and refuses to vindicate his rights with even the benign remedy of new punishment proceedings.

■ In the instant case, the State concedes the trial court erred in omitting the punishment instruction from the jury charge but relies on *White* to argue the trial court's error was harmless. We find White distinguishable because of the facts of the underlying offense and because of the conduct of the State's attorney at trial.

*White* involved a loathsome, violent crime. The defendant intentionally raped Elizabeth St. John, a fragile 72–year–old woman who weighed 92 pounds. He then killed her by strangling her and stabbing her with a screwdriver. In finding the disputed error harmless, the Court of Criminal Appeals focused on the facts of the case, which it thought sufficiently important to recite in some detail:

> At the punishment phase, the State introduced evidence that appellant had strangled and suffocated to death an 80 year old woman in Orlando, Florida, a matter of days before he murdered Elizabeth St. John in Houston. According to a confession introduced at punishment, ap-

1. Justice Chapa's dissenting opinion in *Castaneda* thoroughly and accurately traces the anomalous history of harmless error analysis with respect to the omission from a jury charge of a no-adverse-inference instruction. Justice Chapa noted the *Carter* Court expressly declined to hold that such error can never be harmless because the issue was not presented to the Kentucky Supreme Court, and then turned his attention to the odd manner by which the Court of Criminal Appeals came to apply the harmless error rule in this situation, which it did for the first time in *Beathard v. State,* 767 S.W.2d at 423. Referring to *Brown v. State,* 617 S.W.2d at 234, in which the Court of Criminal Appeals followed *Carter* and held that the omission of a no-adverse-inference punishment instruction "is reversible error," Justice Chapa observed:

> It is interesting to note that in *Brown,* the Texas Court of Criminal Appeals clearly based its en banc opinion on what the United States Supreme Court said in *Carter,* holding that "where a request is made to the trial court to add to its charge at the punishment stage of the trial an instruction on the failure of the defendant to testify, or an objection is made to the omission of such charge, it is reversible error if the trial court fails to honor that request or objection" without any mention whatsoever about the harmless error rule. *Brown,* 617 S.W.2d at 238.

> However, without actually overruling *Brown,* the Texas Court of Criminal Appeals, in what appears to be an afterthought, applied the harmless error rule for the first time in *Beathard,* ironically basing this action on what the United States Supreme Court **refused to say** in the same *Carter* opinion. *Castaneda v. State,* 852 S.W.2d at 299–300 n. 4.

pellant was hired to do some yard work for the elderly Mae Bailey, who he subsequently choked with his hands and suffocated with a pillow. He then took an antique clock from her house, as well as $25.00, a suitcase full of papers and the victim's 1965 Plymouth Valiant, which he ultimately drove to Houston. Appellant sold the clock to an antique shop. He retained the papers, which included the registration to the Valiant.

Appellant confessed to the murder of Mae Bailey at the same time he confessed to the remarkably similar murder of Elizabeth St. John to law enforcement officials in Myrtle Beach, South Carolina. According to Mitchell Kemp, appellant at that time made no expression of regret for his deeds or remorse for his victims.

The State also introduced reputation for violence evidence from Ron Blazer, the former Chief of Detectives for the City of Lancaster, Ohio, Police Department. Also, detailed evidence that appellant was in the process of committing a burglary of Romondo's restaurant when he was arrested in Myrtle Beach was elicited. This evidence had been excluded by the trial judge at the guilt phase.

Appellant offered no evidence at the punishment phase.

In view of the evidence offered at punishment, coupled with the evidence adduced in the guilt/innocence stage, we cannot say the trial court's failure [to] give the requested charge was calculated to injure the rights of the defendant in this case. Finding that this could not have contributed to the jury's answers to the special issues under the record before us, we conclude he suffered no harm from the omission of the requested charge.

*White v. State,* 779 S.W.2d at 828.

Unlike *White,* the instant case involves a property crime. Appellant is accused of kill-ing no one. No helpless citizen's person was attacked. Sosa's safety was not even threatened. Appellant offered no resistance when Sosa apprehended him and waited obediently while Sosa went to a neighbor's house to summon police. Appellant actually cried when he was caught, and begged Sosa for his release. If one guilty of burglary of a habitation can ever be characterized as docile, Appellant is he. While the defendant in *White* offered no evidence at the punishment stage, Appellant called several family members as witnesses, who testified that Appellant was a good brother, son, husband, and father-figure, as well as a hard worker and church-goer. We find that the parade of punishment witnesses who testified **about** Appellant only raised the jury's expectation to hear similar evidence directly **from** Appellant, which increased the already substantial risk that it would penalize Appellant for his silence. Further, Appellant was sentenced to imprisonment for a term of 45 years, while the available punishment ranged from terms of 25 years to life. Although the defendant in *White* was sentenced to death, there was overwhelming evidence of his guilt and, more importantly, of his brutality and cruelty. Appellant told Sosa he was impoverished. Although this does not excuse his conduct, we find it to be precisely the kind of evidence a jury would consider in assessing a reduced punishment. Moreover, we cannot conclude with any degree of certainty that the jury's consideration of Appellant's failure to testify did not result in the assessment of at least a marginally increased sentence, especially since the jury had available to it a range of lesser punishments that spanned 20 years. Because Appellant's offense is a mere property crime and because he called several witnesses at the punishment stage of trial, we find *White* does not extinguish a reasonable doubt that Appellant suffered no harm from the omission of a no-adverse-inference punishment instruction[2].

---

2. Although the State does not cite *Beathard,* its distinguishability is even more apparent. *Beathard* involved the intentional murder of three persons pursuant to a conspiracy that a relative of the victims helped plan. The defendant actually testified during guilt-innocence about "his current and past employment, his educational attainments, his family background, and his lack of any criminal record." *Beathard v. State,* 767 S.W.2d at 433 n. 17. Given the breadth of the defendant's testimony, the Court of Criminal Appeals observed that "we can think of nothing else that [the defendant] could have said during the punishment phase that he had not already said." *Id.* The Court then took care to announce that

We place greatest emphasis on the change in harmless error analysis effected by *Harris v. State*, 790 S.W.2d 568 (Tex.Crim.App. 1989), and the significance it imputes to the conduct of the State's attorney in the instant case. *Harris* states:

> In summary, a reviewing court in applying the harmless error rule should not focus upon the propriety of the outcome of the trial. Instead, an appellate court should be concerned with the integrity of the process leading to the conviction. Consequently, the court should examine the source of the error, the nature of the error, whether or to what extent it was emphasized by the State, and its probable collateral implications. Further, the court should consider how much weight a juror would probably place upon the error. In addition, the Court must also determine **whether declaring the error harmless would encourage the State to repeat it with impunity.** In summary, the reviewing court should focus not on the weight of the other evidence of guilt, but rather on whether the error at issue might possibly have prejudiced the jurors' decision-making; it should ask not whether the jury reached the correct result, but rather whether the jurors were able properly to apply law to facts in order to reach a verdict. Consequently, the reviewing court must focus upon the process and not on the result. In other words, a reviewing court must always examine whether the trial was an essentially fair one. If the error was of a magnitude that it disrupted the jurors' orderly evaluation of the evidence, no matter how overwhelming it might have been, then the conviction is tainted. Again, it is the effect of the error and not the other evidence that must dictate the reviewing court's judgment.

> ... A procedure for reaching this determination should: first, isolate the error and all its effects, using the considerations set out above and any other considerations suggested by the facts of an individual case; and second, ask whether a rational trier of fact might have reached a different result if the error and its effects had not resulted.

*Harris v. State*, 790 S.W.2d at 587–588 (emphasis added). As might be deduced from our alteration to the quotation, the phrase we emphasize has particular relevance to our facts. In it, the Court of Criminal Appeals for the first time, as far as we can discern, counsels courts to consider "whether declaring the error harmless would encourage the State to repeat it with impunity." *Id.* at 587. Significantly, *Harris* was decided after *White*, in which there is no indication that the State's conduct had a role in causing the error. In contrast, here the State affirmatively urged the trial court to omit the required instruction. Given the above, we are unable to conclude beyond a reasonable doubt that no harm came to Appellant by the trial court's failure to give the no-adverse-inference instruction. Accordingly, we sustain Appellant's second, third, and sixth points of error [3].

■ In Point of Error No. One, Appellant claims the State impermissibly commented on his failure to testify during the State's closing argument [4]. Proper jury argument includes:

its decision was "[l]imited to the unusual factual setting of this case...." *Id.* at 433.

**3.** These points of error either allege error generally or do so based on the United States Constitution. We find it unnecessary to address Appellant's fourth and fifth points of error, which rely on the Texas Constitution. Appellant's seventh point of error is not intelligible and is briefed together with his second through sixth points of error. We therefore do not address it.

**4.** Specifically, Appellant complains of the following exchange:

> STATE'S ATTORNEY: We have Mr. Sosa driving down the street he knows, he lives on, for the very purpose of checking on his house. He comes around the corner.... He sees a car he doesn't know. He sees a man he doesn't know.... "What is that guy doing at my house?"
>
> When the guy on the porch looks at him, he looks away....
>
> So Mr. Sosa drives on past and then he hangs a U-turn. Then he ... waits for two or three minutes before he ever drives back to the house. Remember, you're the judges of what he said and whether he said it right or not, not [the defendant's attorney] and what he would have you believe the amount of time that elapsed. So right there is three minutes.
>
> Then he drives back to the house.... [H]e had to drive past it a little bit because he

(1) a summary of the evidence;

(2) a reasonable deduction from the evidence;

(3) a response to argument from opposing counsel; and

(4) a plea for law enforcement.

*Borjan v. State,* 787 S.W.2d 53, 55 (Tex.Crim. App.1990); *Mock v. State,* 848 S.W.2d 215 (Tex.App.—El Paso 1992, pet. ref'd); *Burton v. State,* 830 S.W.2d 197 (Tex.App.—El Paso 1992, no pet.).

 The State's argument was merely an invitation for the jury to query where Appellant could have been given the time Sosa claimed elapsed and the physical layout of the premises. Appellant attempts to overcome this obvious difficulty by claiming the State could have permissibly asked "where could Appellant have been," if that was what it intended. The first clause of the disputed sentence, however, effectively focuses attention on Appellant's possible location and renders the statement as a whole nearly identical in meaning to the hypothetical statement Appellant concedes would have been permissible. Further, in responding to the objection, the State's attorney made clear that he was "just asking where he could have been physically." The statement itself and the explanation thereof suffice to render it so like the hypothetical statement Appellant concedes would be permissible that we find it was not a comment on Appellant's failure to testify.

 Even if the disputed statement was a comment on Appellant's failure to testify, we find it was a permissible response to Appellant's cross-examination of Sosa and his closing argument. Appellant's theory at trial was that Appellant merely took his brother-in-law, "Antonio," to Sosa's home and never actually entered the residence. Appellant's trial attorney asked Sosa if he saw another person in the yard or in the house, if Appellant had made various references to "Antonio," if he heard "Antonio" calling to Appellant from the backyard, and if "Antonio" had told Appellant to run as he fled the scene on foot. Sosa answered each of these questions in the negative. Appellant's trial attorney also argued that there was insufficient time for Appellant to enter the house and disturb its contents in the manner Sosa claimed they were disturbed. Given this predicate, we find that the State's argument was a justified and calculated response to Appellant's dual theories that "Antonio" was the culprit and that Appellant could not have caused the damage to Sosa's home and property in the time Sosa claimed elapsed. It was a suggestion that Appellant could have been nowhere other than inside the house during the relevant time period. Accordingly, we overrule Appellant's first point of error.

 In Points of Error Nos. Eight and Nine, Appellant complains of the trial court's admission of alleged hearsay statements made by Officer Perez[5]. We find the state-

couldn't see through the garage if the guy was still at the front door. The guy is not at the front door, *so he hangs another U-turn.* More time has elapsed. He pulls into his driveway and blocks the driveway. More time has elapsed. He walks to the front door. More time had elapsed. Then he ... checked the door. It wasn't broken into or anything.

Where is Mr. Ulloa? Where is this Defendant? If Mr. Martin claims he wasn't inside the house, where is he? Because he can see—
DEFENSE ATTORNEY: Objection. Comment on my client's fifth—
STATE'S ATTORNEY: Your Honor, responding to argument. He stated that Mr. Sosa could not have seen where he was and that he could not have done what he did during that time frame. I'm just asking where he could have been physically.
THE COURT: All right. Overruled.

5. Specifically, Appellant complains of two portions of Perez's testimony. The first follows:

Q. Did you investigate the scene?
A. Yes, sir, I did.
Q. What was your conclusion based on your investigation?
DEFENSE ATTORNEY: Objection, Your Honor, under hearsay.
....
THE COURT: Overruled.
DEFENSE ATTORNEY: Objection, Your Honor, under back door hearsay.
THE COURT: Overruled.
....
A. The conclusion I reached was that, in fact, a burglary had occurred at that residence.
Shortly thereafter, the State's attorney questioned Perez in an effort to introduce photos depicting the rearranged property in Sosa's home:

ments in the first disputed portion of Perez's testimony are not hearsay. Among other definitional requisites, hearsay must consist of a statement. TEX.R.CRIM.EVID. 801(d) (definition of hearsay). A statement may consist of a verbal expression or of conduct intended as a substitute therefor. TEX. R.CRIM.EVID. 801(a) (definition of statement). In the disputed testimony, Perez testified to only two facts: (1) he investigated; and (2) he reached a conclusion. He does not recount the out of court statement of another person. He does not recount his own out of court statement. He does not claim to have spoken to anyone or to have himself said anything at the scene. He does not even imply that he spoke with anyone at the scene. Bare testimony that Perez investigated and concluded provides no evidence of a statement at which Appellant could have directed a hearsay objection. *Cf. Alexander v. State*, 820 S.W.2d 821, 823 (Tex.App.—Waco 1991, pet. ref'd) (deeming testimony that discussion took place not hearsay because not a statement). Appellant's eighth point of error is therefore overruled.

■ We further find the statements in the second disputed portion of Perez's testimony were not hearsay because they were not offered for the truth of the matters asserted, but merely to explain why the photos were taken. Perez offered similar testimony about at least two other photos without Ap-

pellant's objection. The jury was likely able to infer from this unobjected to testimony that the entire series of photos depicted items inside the house that Sosa identified as misplaced. Further, Perez's testimony essentially consisted of the declarative statement that the exhibit was a photo of an item, and an explanation that he took the photo because he thought it had evidentiary value based on Sosa's statements. Thus, the objected to testimony only made more explicit what the jury already had the chance to glean from Perez's other testimony: that Perez selected the subjects of the photographs based on information provided by Sosa. This reveals that the disputed testimony about Sosa's statements was important for the very fact it established that Sosa uttered them, independent of the veracity of those statements.

■ Even if the statements were offered for their truth and were impermissibly admitted into evidence, we find any harm they caused cured by Sosa's later testimony about the same two disputed photos and the items they depicted. An error in the admission of evidence is cured when the same evidence is later admitted without objection. *Butler v. State*, 769 S.W.2d 234, 241 (Tex.Crim.App. 1989). Sosa testified that exhibits seven and eight were photos of items that were not located as they were when he left for work the morning of the burglary [6], to which testi-

> Q. Officer, would you go through each photograph and describe what the photograph shows?
> . . . .
> A. ... Number 7 is a view of the complainant's living room showing a tool box in the living room floor, which information he provided me was also moved.
> DEFENSE ATTORNEY: Objection, Your Honor, as to hearsay.
> THE COURT: Overruled.
> THE WITNESS: State's Exhibit Number 8 is in a bedroom, shows a bedroom with clothes in disarray, and a television set on the bed; again, items that the complainant informed me had not been there previously.
> DEFENSE ATTORNEY: Objection, Your Honor, as to hearsay.
> THE COURT: Overruled.

6. Sosa's curative testimony about exhibits seven and eight follows:
> A. I was hoping not to find anyone in there. Anyway, when I opened the door, as soon as I

> opened it, I noticed my tool box. It was right in front.
> . . . .
> Q. Let me show you a photograph that's been previously admitted into evidence as State's Exhibit Number 7. Is that a photograph of your tool box?
> A. Yes, sir.
> Q. Is that how it was?
> A. No, sir.
> . . . .
> Q. Had the tool box been there when you left that morning?
> A. No, sir. That's kept in the garage.
> . . . .
> Q. State's Exhibit Number 6 shows what looks to be a utility area, washer dryer?
> A. Yes, sir.
> Q. Is this how it normally appears?
> A. No, sir.
> Q. What's different about what's in the picture?
> A. Well, the only—besides my wife's clothes hanging on the hangers there, the vacuum

mony Appellant did not object. Any error in the admission of Perez's testimony to the same effect was therefore harmless. Accordingly, we overrule Appellant's ninth point of error.

■ In his tenth and final point of error, Appellant challenges the sufficiency of the evidence that he perpetrated the burglary, claiming that anyone in the vicinity could have done so. In reviewing the sufficiency of the evidence, we are constrained to view the evidence in the light most favorable to the judgment to determine whether any rational trier of fact could find the essential elements of the offense, as alleged in the application paragraph of the charge to the jury, beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Geesa v. State*, 820 S.W.2d 154, 159 (Tex.Crim.App.1991); *Butler v. State*, 769 S.W.2d 234, 239 (Tex.Crim.App.1989); *Humason v. State*, 728 S.W.2d 363, 366 (Tex. Crim.App.1987). Our role is not to ascertain whether the evidence establishes guilt beyond a reasonable doubt. *Stoker v. State*, 788 S.W.2d 1, 6 (Tex.Crim.App.1989), *cert. denied*, 498 U.S. 951, 111 S.Ct. 371, 112 L.Ed.2d 333 (1990); *Dwyer v. State*, 836 S.W.2d 700, 702 (Tex.App.—El Paso 1992, pet. ref'd). We do not resolve any conflict in fact, weigh any evidence or evaluate the credibility of any witnesses, and thus, the fact-finding results of a criminal jury trial are given great deference. *See Adelman v. State*, 828 S.W.2d 418, 421 (Tex.Crim.App. 1992); *Matson v. State*, 819 S.W.2d 839, 843 (Tex.Crim.App.1991); *Leyva v. State*, 840 S.W.2d 757, 759 (Tex.App.—El Paso 1992,

pet. ref'd); *Bennett v. State*, 831 S.W.2d 20, 22 (Tex.App.—El Paso 1992, no pet.). Instead, our only duty is to determine if both the explicit and implicit findings of the trier of fact are rational by viewing all the evidence admitted at trial in the light most favorable to the verdict. *Adelman*, 828 S.W.2d at 421–22. In so doing, any inconsistencies in the evidence are resolved in favor of the verdict. *Matson*, 819 S.W.2d at 843 (quoting *Moreno v. State*, 755 S.W.2d 866, 867 (Tex.Crim.App.1988)).

■ The evidence of Appellant's guilt is overwhelming. Our earlier summary of the evidence is taken largely from Sosa's trial testimony, which we here briefly summarize. Appellant was wearing the same clothes as the stranger Sosa saw on his first slow pass by the house, and Appellant was wearing the same jeans and boots as the person Sosa saw escaping through a window. Appellant wept and begged Sosa for his release while pinned in his car parked in the driveway. The police then matched footprints found outside the broken bedroom window with Appellant's boots. Appellant's defense theory that he waited outside while his brother-in-law entered the dwelling was refuted by Sosa's clear testimony that no other persons were in the area, not even his neighbors. Indeed, Sosa portrayed the entire drama as eerily silent. In short, Sosa caught Appellant red-handed. We find that the jury was presented with ample evidence on which it could rationally base a conclusion that Appellant was guilty, and accordingly, we overrule Point of Error No. Ten.

cleaner is out of place, and the door is open to the garage.
. . . .
Q. And would this door that's depicted as being open, is that the door that would lead to where your tool box was originally?
A. No, sir. This door leads to the laundry room, and this door leads to the garage.
Q. Okay. *And it wasn't like that when you* left that morning for work?
A. No, sir, it's always locked.
Q. State's Exhibit Number 8, what is depicted in that photograph?
A. That's the upstairs bedroom, spare room.
Q. That's also a spare room?
A. Yes sir.
Q. There's a television set on the bed, is that correct?

A. Yes, sir.
Q. Did you leave that television there?
A. No, sir.
Q. Where was the television when you left for work?
A. It's on the study table.
Q. And is the television as shown here on the bed, is it plugged in or unplugged?
A. It's unplugged.
Q. Was it plugged in or unplugged when you saw it?
A. Plugged in.
Q. There appears to be a lot of stuff on the bed. Is that the way it normally was?
A. No, sir.

Having overruled Points of Error Nos. One, Eight, Nine and Ten, but having sustained Points of Error Nos. Two, Three and Six, we reverse the judgment of the trial court and remand this cause to it for new sentencing proceedings.

MCCOLLUM, J., not participating.