**Timothy James VENHAUS, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 08–95–00338–CR.**

Court of Appeals of Texas,
El Paso.

July 3, 1997.

Rehearing Overruled July 30
and Sept. 10, 1997.

Richard L. Ainsa, El Paso, for Appellant.

Jaime E. Esparza, District Attorney, El Paso, for Appellee.

Before LARSEN, McCLURE and CHEW, JJ.

## OPINION

LARSEN, Justice.

Timothy Venhaus appeals his convictions for the offenses of murder and attempted murder. We affirm.

### FACTS

Timothy Venhaus was sixteen years old when, on November 10, 1993, he repeatedly fired a shotgun through the door of his French teacher's home, wounding her and inflicting wounds that eventually killed her husband. Venhaus has suffered from behavioral disorders and mental problems since the age of six. Earlier in 1993, he was referred to a psychologist after school officials found a note stating he planned to kill himself and a classmate. Venhaus was hospitalized by Dr. Arthur Ramirez for seven days in April 1993, then treated in a partial release program. Dr. Ramirez diagnosed Venhaus as suffering from bipolar affective disorder, and prescribed lithium carbonate to control the illness. Venhaus was shortly readmitted to the hospital after overdosing on his lithium. His doctor described Venhaus as "very fragile and depressed" and recommended long-term hospitalization. Nevertheless, Venhaus was released from the hospital in May and finished the school year. His family was unable to afford continued treatment.[1]

Venhaus was in Gudrun Aguirre's French class in the fall of 1993. The two had a series of altercations which escalated until on

---

1. Apparently, doctors reviewing the case for Venhaus' medical insurer refused to certify him for further in-patient treatment. This recommendation was strongly controverted by Dr. Ramirez, who went so far as to complain to the American Psychiatric Association about the reviewing doctors' refusal to certify Venhaus.

one occasion Venhaus stormed out of the classroom. Aguirre followed him into the hall, where he pushed her up against the lockers asking "do you want to fight?" Venhaus was placed in a restrictive "Behavior Improvement Class" after this incident. Venhaus blamed Aguirre for his placement in the BIC, and told his friend, Eddie Cuellar, he planned to kill her.

On November 9, 1993 around 10 p.m., Venhaus surreptitiously left his house and went to visit Eddie Cuellar. Cuellar described Venhaus as "real excited, real hyper, couldn't sit down, wanted to talk, wanted to go do something, . . . he was just pacing back and forth . . . couldn't sleep, hyper." Cuellar testified that Venhaus suggested "let's go kill some people . . . I know the perfect place," and then told Cuellar an address on Sierra Madre. Cuellar went to sleep around midnight, telling Venhaus he could spend the night there. Sometime later, Venhaus took a shotgun and a coat from Cuellar's house. Cuellar testified there was no ammunition for the gun in the house.

Around 3 a.m., someone knocked loudly on the door of Gudrun and Anthony Aguirre's home at 4824 Sierra Madre. They both went to the front door. Mr. Aguirre looked through the blinds of the window next to the door and told his wife it was one of her students. She looked through the blinds, recognized Venhaus, and believed he saw her as well. The Aguirres did not open the front door, and Ms. Aguirre turned to get a bathrobe. About ten seconds later, she heard loud shots and was sprayed with shotgun pellets. Ms. Aguirre fled through the back door to get help. When she returned, Mr. Aguirre was lying on the floor of the living room. The front door was still closed.

Shortly after the shooting, two police officers (who knew nothing of the Aguirre shooting) found Venhaus about a block from the Aguirre's home. Venhaus was carrying a gun and was "screaming in a hostile-type nature." Although ordered to drop the gun, Venhaus continued to hold it and repeated "shoot me, shoot me." Venhaus finally eject-

ed a shell from the shotgun and dropped the firearm. Once subdued, the officers testified that Venhaus was emotional and crying but cooperative. At some point, Venhaus told the officers, "I don't know if they've been hit."

Ms. Aguirre was treated for her wounds and recovered. Mr. Aguirre died of his wounds.

### Charge on Criminally Negligent Homicide

In his Point of Error One, Venhaus urges that the trial court committed harmful error in refusing to charge the jury on the lesser-included offense of criminally negligent homicide.[2] Although the trial court charged the jury on murder and involuntary manslaughter, it refused Venhaus' requested criminally negligent homicide charge. The jury found Venhaus guilty of murder, rejecting the only lesser-included offense it could consider. Finding that the trial court erred in failing to charge on criminally negligent homicide, but further finding that such error resulted in no harm, we overrule the point.

█ We apply a two-prong test in determining whether a defendant is entitled to an instruction on a lesser-included offense. See *Bignall v. State*, 887 S.W.2d 21, 23 (Tex. Crim.App.1994)(en banc); *Rousseau v. State*, 855 S.W.2d 666, 672 (Tex.Crim.App.1993)(en banc). The first prong requires that "the lesser included offense must be included within the proof necessary to establish the offense." *Bignall*, 887 S.W.2d at 23. Under the second prong, "some evidence must exist in the record that would permit a jury rationally to find that if the defendant is guilty, he is guilty only of the lesser offense." *Id.*

█ Criminally negligent homicide is a lesser-included offense of murder. *Saunders v. State*, 840 S.W.2d 390, 391 (Tex.Crim.App. 1992)(en banc); *Jones v. State*, 900 S.W.2d 103, 105 (Tex.App.—Houston [14th Dist.] 1995, no pet.). Thus, the first prong of the test is met. We must determine, therefore, whether the record contains evidence that Venhaus is guilty of only criminally negligent

---

2. The State urges by reply point that appellant's testimony at punishment waives error under *De-Garmo v. State*, 691 S.W.2d 657, 661 (Tex.Crim. App.1985)(en banc). We will not address the issue because of our disposition on the merits.

homicide. *Saunders,* 840 S.W.2d at 391; *Rousseau,* 855 S.W.2d at 673; *Jones,* 900 S.W.2d at 105.

 In making that determination, we examine all the evidence for any that would support a verdict of guilt only on the lesser charge. *Bignall,* 887 S.W.2d at 23. A mere scintilla of evidence will entitle defendant to the lesser charge. *Id.* We do not consider credibility of witnesses or conflicts in the evidence. *Saunders,* 840 S.W.2d at 391. A defendant's own testimony, though contradicted, is sufficient to require a lesser-included instruction. *Hunter v. State,* 647 S.W.2d 657, 658 (Tex.Crim.App.1983)(en banc); *Jones,* 900 S.W.2d at 106.

 Involuntary manslaughter and criminally negligent homicide are mutually exclusive lesser-included offenses of murder. *Saunders v. State,* 913 S.W.2d 564, 572 (Tex. Crim.App.1995)(en banc). A person commits involuntary manslaughter by recklessly causing the death of another. *Jones,* 900 S.W.2d at 105; *Ybarra v. State,* 890 S.W.2d 98, 110 (Tex.App.—San Antonio 1994, pet. ref'd). A person commits criminally negligent homicide by causing the death of another through criminal negligence. *Jones,* 900 S.W.2d at 105; *Ybarra,* 890 S.W.2d at 110. Involuntary manslaughter requires a finding that defendant was aware of the risk but consciously disregarded it; criminally negligent homicide requires a finding that defendant ought to have been aware of the risk but failed to perceive it. *Jones,* 900 S.W.2d at 105; *Ybarra,* 890 S.W.2d at 110–11. "The key to criminal negligence is the failure of the actor to perceive the risk." *Richardson v. State,* 816 S.W.2d 849, 850 (Tex.App.—Fort Worth 1991), *after remand,* 906 S.W.2d 646 (Tex. App.—Fort Worth 1995, pet. ref'd), *quoting Still v. State,* 709 S.W.2d 658, 660 (Tex.Crim. App.1986).

 Examining the evidence in this light, we find that there was evidence entitling Venhaus to a charge on criminally negligent homicide. His two treating psychiatrists, Arthur Ramirez and Mariam Marvasti, agreed that he suffered from a serious mental illness, bipolar affective disorder. Bipolar disorder, according to Dr. Ramirez, involves mood shifts from extreme depression to manic phases characterized by restlessness, sleeplessness, and impulsive behavior. A bipolar patient in the manic phase may have an inhibited ability to recognize the consequences of impulsive behavior, and may not even know what the consequences of a given act are at the time. A patient in the related hypomanic phase of the disease will likewise have diminished judgment.

Dr. Marvasti testified that Venhaus, if in a hypomanic phase, would be unable to understand or appreciate the consequences of his actions. She testified that based upon the description of Venhaus provided by Eddie Cuellar, he was probably in a hypomanic phase of his illness the night of the shooting. She stated that:

> I think his judgment was diminished, not completely impaired, because he was aware that he was doing something wrong, but not knowing that what are the consequences of what he's doing will be.

She testified that Venhaus may have shot through the Aguirre's door in frustration and anger, without understanding that his act could cause injury. The evidence was contradictory as to whether the front door was open or closed when Venhaus fired the shotgun. Further, Venhaus' mother testified that she gave him his medication every day assuming he would take it, but later found it in his drawer. Dr. Marvasti testified that a patient's failure to take medication could cause a lapse into either the manic or depressive state. We find this evidence supported a charge on criminally negligent homicide. That is, a jury could have found that even though Venhaus ought to have been aware that his actions created a substantial and unjustifiable risk, that because of his disease, he was unable to perceive the risk. Because the evidence is subject to different interpretations and did raise the issue of criminal negligence, the trial court erred in refusing to submit Venhaus' requested instruction on criminally negligent homicide.

 We now turn to the troubling question of whether the error in this case was harmless. We must reverse upon a finding of error, unless we determine beyond a reasonable doubt that the error did not

contribute to Venhaus' conviction or punishment. TEX.R.APP.P. 81(b)(2). As this is a case of charge error over timely request and objection, we reverse if the error resulted in some harm. *Ulloa v. State,* 901 S.W.2d 507, 511 (Tex.App.—El Paso 1995, pet. ref'd); *Almanza v. State,* 686 S.W.2d 157, 172 (Tex.Crim.App.1984)(en banc). We review the entire record to determine whether defendant suffered some harm as the result of the error. *Arline v. State,* 721 S.W.2d 348, 352 (Tex.Crim.App.1986)(en banc).

Finding some harm is a relatively simple task where the failure to submit a lesser included offense limited the jury to the two options of convicting on the greater offense or acquittal. *Saunders,* 913 S.W.2d at 571; *Gibson v. State,* 726 S.W.2d 129, 133 (Tex.Crim.App.1987)(en banc); *Hayes v. State,* 728 S.W.2d 804, 810 (Tex.Crim.App.1987)(en banc). A jury, faced with a reasonable doubt on a greater offense but not given the option of convicting on a lesser offense, might well choose to convict rather than acquit. Harm would almost certainly be present in such a situation. We face a more complicated situation here, however. Venhaus was convicted of murder, the jury rejecting the lesser-included offense of involuntary manslaughter. That the jury convicted Venhaus of a more serious offense, although given the option of one requiring less culpability, would at first blush seem to invite a harmless error finding without further inquiry. The Court of Criminal Appeals has cautioned, however, that a harm analysis is still required even where the jury has rejected at least one other lesser-included offense contained in the charge. *Saunders,* 913 S.W.2d at 572. *Saunders* explains the dilemma in a case which presented the very question before us here:

> [I]t is important to recognize that involuntary manslaughter and negligent homicide are mutually exclusive lesser included offenses of murder. Both require the existence of conduct that creates a substantial and unjustifiable risk of death. But in the former, the accused must be aware of the risk, and consciously disregard it. In the latter it must be found that, though he ought to have been aware of the risk, he was not.

> . . . . .

> On the facts of this case the jury could rationally find appellant was 'guilty only of' *either* murder *or* involuntary manslaughter *or* negligent homicide. It would be rational, moreover, on such a state of the evidence, for a jury to decide it did not accept the inference of recklessness, and that it must therefore choose between the competing inferences that remain, *viz:* whether appellant harbored a specific intent to cause serious bodily injury, or he harbored no such intent and simply did not realize the substantial and unjustifiable risk his conduct generated. *Saunders,* 913 S.W.2d at 572, 573 [emphasis in original].

The *Saunders* court held that in order to find harm, the record must admit a "realistic probability"[3] that the jury's decision was reduced to two possibilities: that defendant intended to cause serious bodily injury or death, or never perceived the obvious risk his conduct created. *Saunders,* 913 S.W.2d at 573. If so, and if the option of finding that defendant committed involuntary manslaughter is palpably unlikely under this evidence, then we must find harm, despite the jury's failure to find Venhaus guilty of the lesser-included offense. *Id.*

We think the record here fails to support a realistic probability of the dilemma described in *Saunders.* The evidence contains ample evidence upon which the jury could have relied in finding Venhaus guilty of murder: his earlier threats toward · Ms. Aguirre, his suggestion to Eddie Cuellar "let's go kill someone" with an address that

---

**3.** In *Saunders,* the Court of Criminal Appeals appears to have created a new standard for evaluating "some harm" without much guidance as to how this standard is to be applied. In his dissent, Justice Maloney stated that "it [did] not appear to [him] that the Court's application of the 'realistic probability' test for determining *some* harm differs in any decipherable way from the analysis that would apply in assessing egregious harm." *Saunders,* 913 S.W.2d at 577 (*Maloney, J. dissenting*). If this is so, no advantage would be gained by the defendant in timely objecting to the charge. We must conclude that "realistic probability" is an additional requirement to be met beyond the familiar *Almanza* standard of *some* harm. We would welcome further guidance from the Court of Criminal Appeals on the issue.

was clearly the Aguirres' home, his theft of the shotgun from Cuellar's house, and his obtaining of ammunition for the gun from some other source. Venhaus knocked on the door at approximately 3 a.m., waited long enough for Ms. Aguirre and her husband to reach the door and look through the blinds, and only then fired the shotgun. This evidence points to intentional murder.

Conversely, the psychiatric testimony that hypomanic individuals cannot appreciate the risks involved in their behavior, together with Venhaus' testimony that he did not see anyone behind the door when he shot, support both lesser-included offenses of involuntary manslaughter and criminally negligent homicide. We cannot find a realistic probability, however, that this testimony would have forced the jury to choose between murder and acquittal because involuntary manslaughter was so unlikely under the evidence presented. We cannot conclude that conscious disregard of a known risk was the *least* likely explanation for Venhaus' behavior. Had the jury rejected the evidence of the intentional nature of Venhaus' conduct, we believe they would in all probability have moved to consider evidence of his mental illness as probative of reckless behavior. The same evidence raising the issue of criminally negligent homicide here could also support a conviction for involuntary manslaughter. We do not find a realistic probability that a jury could determine that Venhaus wholly failed to perceive the likely outcome of firing a shotgun through the front door of a residence, point blank, at 3 o'clock in the morning, after banging on the door and waiting sufficient time to rouse the inhabitants. Thus, we conclude that it is not within the realm of reasonable probability that the jury was forced to decide between intentional murder and a non-existent option of negligent homicide because the option of involuntary manslaughter was not credible under the evidence. Involuntary manslaughter was a viable theory, the jury rejected it, and we will respect the fact finders' determination. Venhaus' first point of error is overruled.

### Admission of Defendant's Statement While in Custody

In his second point of error, Venhaus urges that the trial court erred in admitting his oral statement to police officers after arrest. He urges the statement was the result of custodial interrogation, and thus inadmissible if not in compliance with TEX. CODE CRIM.PROC.ANN. art. 38.22, § 3 (Vernon 1979 and Supp.1997). We find he has waived this point.

Shortly after the shooting, Venhaus was taken into custody. One of the officers processing his arrest testified that Venhaus commented to them that they could hold him only six hours. Defense counsel objected to the admission of this testimony before it was given. Without expressly ruling on the objection, the trial court admonished the State that voluntary statements were admissible, but that the court would exclude any statement resulting from police questioning. During the officer's testimony, defense counsel again objected to the "six hours" statement. Again without ruling, the trial court warned the State its questions must be limited to voluntary statements. Defense counsel did not pursue his objection further.

To preserve error for review, a timely and specific objection must be followed by an adverse ruling. TEX.R.APP.P. 52(a); *Ramirez v. State*, 815 S.W.2d 636, 643 (Tex.Crim.App.1991)(en banc); *Murillo v. State*, 839 S.W.2d 485, 493 (Tex.App.—El Paso 1992, no pet.). If the trial court refuses to rule, the objecting party may preserve error by objecting to such failure. TEX.R.APP.P. 52(a). A response by the trial court merely qualifying or limiting a line of questioning, however, does not constitute a ruling on the objection and does not preserve error. *Murillo*, 839 S.W.2d at 493. Here, the trial court's admonishments did not constitute a ruling sufficient to preserve error, nor did defense counsel request a ruling or object to its absence. Any error was waived. We overrule appellant's second point of error.

### Evidence of Prior Problems with Gudrun Aguirre

In his third and fourth points of error, Venhaus contends that the trial court erroneously permitted Gudrun Aguirre and Wade Horsch to testify about Venhaus' prior as-

sault on Gudrun Aguirre. He urges this is inadmissable character evidence, or alternatively, that its prejudicial effect outweighs its probative value. We again find any error was waived.

Ms. Aguirre testified that on November 3, 1993, Venhaus shoved her against a wall of lockers and raised his fist at her. Mr. Horsch testified that he witnessed this altercation and intervened. Defense counsel objected to this testimony by both witnesses. Later in the trial, however, Assistant Principal Richard Hernandez testified, without objection:

Q: [D]o you recall hearing an incident regarding Mr. Venhaus and Mrs. Aguirre?

A: Yes, I do.

Q: What did you hear about it?

A: I believe it was on a Wednesday afternoon, and I was informed that there was an incident that a student was involved in. There was a teacher that was pushed up against the lockers.

Q: Was that teacher Mrs. Aguirre?

A: Yes, it was.

Similarly, Dr. Marvasti, called as a defense witness, testified upon cross-examination that she had spoken to Venhaus, her patient, about "the incident where he pushed Ms. Aguirre ... against the locker." This testimony also came in without objection.

■■■■ Error regarding improperly admitted evidence is waived if that same evidence is admitted later without objection. *See Ford v. State*, 919 S.W.2d 107, 117–18 (Tex.Crim.App.1996)(en banc); *Rogers v. State*, 853 S.W.2d 29, 35 (Tex.Crim.App. 1993)(en banc). To preserve error, defendant must object every time the evidence is proffered. This rule applies to extraneous offenses. *Madden v. State*, 911 S.W.2d 236, 242 (Tex.App.—Waco 1995, pet. ref'd); *Montalvo v. State*, 882 S.W.2d 902, 902 (Tex. App.—Corpus Christi 1994, no pet.). This rule applies except where the unobjected-to evidence is presented in an effort to meet, rebut, destroy, deny, or explain the improperly admitted evidence. *Rogers*, 853 S.W.2d at 35.

■■■ The testimony of Mr. Hernandez and Dr. Marvasti was not elicited by defendant to meet or rebut the earlier testimony about Venhaus pushing Ms. Aguirre against the lockers. By failing to object to the cumulative testimony on this subject, therefore, even if admission of the evidence was error it was waived. Points of Error Three and Four are overruled.

### Evidence of Venhaus' Threats Against his Mother

In his fifth point of error, Venhaus complains that the trial court erred in admitting testimony from Dr. Ramirez regarding Venhaus' statement that he wanted to kill his mother. He urges that the testimony was elicited in violation of the trial court's order in limine, in violation of the notice requirement of TEX.R.CRIM.EVID. 404(b), and was irrelevant to any issue other than character. We find that, again, Venhaus has failed to preserve the point for review.

In cross-examining Dr. Ramirez, the prosecutor inquired whether the psychiatrist had received information that Venhaus had threatened to kill his mother. The doctor responded in the negative, and defense counsel objected to this as evidence of an extraneous offense. The trial court overruled the objection. The prosecutor then showed the witness a progress report from Venhaus' medical records. Dr. Ramirez read the note before the jury: "at one point the patient also threatened his mother's life." At the end of Dr. Ramirez's testimony, defense counsel offered the medical records in evidence, including the doctor's progress note about Venhaus' threat against his mother.

■■■ By introducing the medical records, which contained the same information as that contained in the prosecutor's cross-examination of Dr. Ramirez, Venhaus has waived complaint regarding the admission of that evidence. *See Murillo*, 839 S.W.2d at 493; *Ford*, 919 S.W.2d at 117–18; *Rogers*, 853 S.W.2d at 35. Point of Error Five is overruled.

### Evidence of "Other Incidents" Involving Venhaus

In his final point of error, Venhaus complains the trial court erred in admitting tes-

timony of Richard Hernandez regarding "other incidents." We find that no error occurred as the testimony was not admitted in evidence.

Richard Hernandez testified that the BIC program was for students with behavioral problems and that Venhaus was already in the program when the first confrontation with Ms. Aguirre occurred. Asked if Venhaus had been in the BIC program from the beginning of the school year, Hernandez responded:

> Yeah. There was some previous incidents that happened the semester before, and because of those incidents, there was a—

The following discussion then ensued at the bench outside the hearing of the jury:

> Defense counsel: —get into any incidents that we haven't discussed yet.

> Prosecutor: I'm going to limit it. I didn't know he would get into it.

> The court: I will caution the jury to disregard that.

The court then admonished the jury:

> In reference to the witness' last comments about the previous year, you will disregard those comments and not consider them for any purpose whatsoever in the trial of this case.

Thus, the "previous incidents" evidence was not before the jury. Venhaus did not move for a mistrial, and therefore he received all the relief he requested. Nothing is preserved for review. *See Fuller v. State*, 827 S.W.2d 919, 926 (Tex.Crim.App.1992)(en banc). We overrule Point of Error Six.

### CONCLUSION

There having been no reversible error in the trial, we affirm appellant's conviction.